IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20 CR 30166-SPM-001 |
| | ) | |
| EMMITT T. TINER, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT TINER'S MOTION TO REVOKE DETENTION ORDER

The United States of America, by and through its attorneys, Steven D. Weinhoeft, United States Attorney for the Southern District of Illinois, and Scott A. Verseman, Assistant United States Attorney for said district, respectfully submits the following Response to Defendant Tiner's "Motion to Revoke Detention Order":

## I.  DETENTION ORDER

On November 25, 2020, United States Magistrate Judge Sison conducted a detention hearing for Defendant Tiner.[1] R. 19.[2] At the hearing, the United States presented a lengthy proffer. The United States also submitted more than 20 exhibits.  At the conclusion of the hearing, Judge Sison took the matter under advisement.  On December 15, 2020, Judge Sison issued a detailed, 12 page detention order.  R. 33.  Judge Sison concluded:  "Defendant poses a serious risk of danger

---

[1]        The official court transcript of the detention hearing is attached to this response as Exhibit 1.  All citations to this transcript are denoted "Det. Tr." and followed by the applicable page number.

[2]        All citations to documents contained in the official district court record of this case are denoted "R." and followed by the applicable document number, and, where appropriate, the applicable document number.

to potential witnesses as well as a serious risk of obstruction, and that there are no conditions or combinations of conditions that could be imposed to alleviate these concerns." R. 33 at p. 11.

Judge Sison began his analysis by examining the statutory sections which permit the Government to move for pretrial detention. R. 33 at p. 2. The judge noted that the Government had invoked 18 U.S.C. § 3142(f)(2)(B), which permits the United States to seek detention where there is "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective juror witness or juror." The court disagreed with the Government that the detention motion was appropriate under § 3142(f)(1)(A), on the grounds that Tiner has been charged with a crime of violence,[3] and under § 3142(f)(2)(A), on the grounds that Tiner is a flight risk. *Id.*

Judge Sison did find, *sua sponte*, that the Government was entitled to move for detention under § 3142(f)(1)(D). R. 33 at p. 3. The judge noted that Tiner has been charged with felony offenses in the present case, and his criminal history includes two or more crimes of violence and/or drug trafficking offenses. *Id.* The court specifically noted Tiner's convictions for Unlawful Use of a Weapon, Felonious Possession/Use of a Firearm, Theft by Threat, and Manufacture/Delivery of Cocaine. *Id.* at 3 – 4. The court also found that the standard of proof to be applied was the "clear and convincing evidence" standard. *Id.* at 5.

---

[3]     The United States respectfully disagrees with the court's conclusion that Tiner has not been charged with a crime of violence in the present case. For purposes of the Bail Reform Act, the term "crime of violence means "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another. . . ." 18 U.S.C. § 3156(a)(4)(A). Counts 9 through 20 of the indictment in this case charge Tiner with Extortion, under 18 U.S.C. § 1951. That statute defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use or actual or threatened force, violence, or fear . . . ." Based upon this definition, the United States submits that the Extortion statute qualifies as a "crime of violence" for purposes of the Bail Reform Act.

     Regardless of the Government's disagreement on this point, this issue had no effect on the court's ruling on the detention issue. Judge Sison correctly concluded that none of the rebuttable presumptions in favor of detention were triggered in this case. R. 33 at p. 2. The United States conceded this point at the detention hearing. Det. Tr. at 36.

Turning to the substance of the motion, Judge Sison stated: "The United States presented compelling evidence which touched on a number of factors relevant to the Court's consideration." R. 33 at p. 5. The court first noted that the Government had presented as exhibits each of the specific text messages underlying the Interstate Communications with Intent to Extort (18 U.S.C. § 875(b)) charges contained in Counts 3 through 6. *Id.* at 6. The judge also cited to another exhibit which was an investigative report of interview. *Id.* During this interview, another victim[4] reported that Tiner threatened him on October 17, 2020. *Id.* After reviewing this evidence, Judge Sison concluded: "The aforementioned exhibits clearly demonstrate the danger posed by the defendant to victim K.G.,[5] who is the purported victim in Counts One through Six." *Id.* at pp. 6 – 7. The judge also noted that these exhibits demonstrated how strong the Government's case is on those counts. *Id.* at p. 7.

Next, Judge Sison considered the six exhibits the Government submitted which consisted of six separate petitions seeking orders of protection against Tiner. R. 33 at p. 7. While noting that the allegations in those petitions do not relate to the charges in the pending indictment, the judge found "they do illustrate a consistent pattern of threats made by the defendant." *Id.* The judge was particularly concerned about the allegations of three separate petitioners, one of whom stated that Tiner "threatened to blow up the petitioner and her children" over a monetary dispute, another who said that Tiner "threatened to hunt him and his family down and cause them bodily

---

[4]      The court mistakenly stated that the October 17, 2020, threat was made to victim K.G. Actually, Tiner made the October 17, 2020, threat to another victim, R.G., who is referenced in several other counts of the indictment, including the Extortion counts contained in Counts 9 through 20. *See* Det. Tr. at 21, 32.

[5]      Judge Sison correctly noted that the initials of the victim referenced in Counts 1 through 6 are "K.G." Later in this Response, however, the United States will refer to a second witness who also has the initials "K.G." For purposes of distinguishing between the two, the United States will refer to the victim referenced in Counts 1 through 6 as "K.G.1" and the other witness as "K.G.2."

harm" if the petitioner did not pay the money Tiner alleged he was owed, and the final one who stated that Tiner had threatened to "kill" him.  *Id.*

Judge Sison acknowledged defense counsel's point that there was no evidence that these petitions resulted in full orders of protection.  R. 33 at p. 8.  However, the judge noted: "Nevertheless, these allegations paint a consistent narrative of the Defendant making threats to accomplish his various aims, which usually involved obtaining money."  *Id.*  The judge also noted that the allegations in the petitions for orders of protection were remarkably similar to those contained in the indictment.  *Id.*  The court further found that the petitions bore an indicia of reliability, because they were made under oath and penalty of perjury.  *Id.*

Judge Sison was also concerned that two of the petitioners alleged that Tiner had threatened to hurt them if they participated in legal proceedings.  *Id.* at pp. 7 – 8.  "The fact that defendant allegedly made threats to prevent someone from talking to the Court (Govt. Exh. 18) similarly demonstrates a willingness to engage in obstructionist behavior.  Thus, it is clear from the evidence presented by the Government that the Defendant poses a serious risk of obstruction and danger to potential witnesses."  *Id.* at 8.

The court also found that the strength of the evidence factor weighed in favor of detention. R. 33 at p. 8.  As noted above, based upon the exhibits presented, the court found the Government's evidence on Counts 1 through 6 to be strong.  *Id.* at 7.  In addition, the court found that other exhibits presented by the Government demonstrated that the Health Care Fraud and Money Laundering counts were likewise very strong.  *Id.* at 8.  The court also determined that Tiner's lengthy criminal history weighed in favor of detention.  *Id.* at 8 – 9.

Judge Sison rejected defense counsel's arguments that conditions could be imposed that would reasonably assure the safety of the community.  R. 33 at p. 9.  The judge noted that even if

4

he imposed home confinement, Tiner would still have the ability to concoct and execute fraud schemes, and threaten witnesses. *Id.* In addition, the court expressed skepticism that Tiner would comply with the Court's orders. *Id.* The court specifically noted that Tiner had failed to comply with a pending order to pay over $100,000 in restitution for a prior fraud conviction, despite the fact that he had had the financial means to fully satisfy that court ordered obligation. *Id.*

Judge Sison concluded by addressing defense counsel's arguments that Tiner's health warranted pretrial release. R. 33 at pp. 10 – 11. The judge acknowledged that Tiner apparently sustained a back injury as a result of an accident during one of his prior incarcerations. *Id.* at 10. The judge also noted that Tiner appeared in a wheelchair at both his arraignment and his detention hearing. *Id.* The court stated, however, that the evidence presented by the Government "calls into question" the extent of Tiner's actual physical disabilities. *Id.* at 11. Specifically, the court noted that the United States had presented video recording exhibits which showed Tiner dancing, attending football games out-of-state, driving, carrying heavy items, and walking (albeit with a slight limp). *Id.* at 10. The court also observed that none of Tiner's vehicles were equipped to handle wheelchairs. *Id.* at 11. The judge further found that the Marshal's Service and the local jail could provide any medical care that Tiner needs. *Id.*

Based upon all of the evidence presented, Judge Sison concluded: "The United States has met its burden of proof by clear and convincing evidence that the Defendant poses a danger to the community, that the Defendant poses a serious risk of danger to potential witnesses as well as a serious risk of obstruction, and that there are no conditions or combinations of conditions that could be imposed to alleviate these concerns." R. 33 at p. 12. Accordingly, the court entered an order of pretrial detention.

5

## II. ANALYSIS

In *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the

Supreme Court discussed at length the history behind the Bail Reform Act, as well as the factors

that the district courts must consider in determining whether to grant bail:

> Responding to "the alarming problem of crimes committed by
> persons on release," S.Rep. No. 98–225, p. 3 (1983), U.S. Code
> Cong. & Admin. News 1984, pp. 3182, 3185 Congress formulated
> the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.* (1982 ed.,
> Supp. III), as the solution to a bail crisis in the federal courts. The
> Act represents the National Legislature's considered response to
> numerous perceived deficiencies in the **\*\*2099** federal bail process.
> By providing for sweeping changes in both the way federal courts
> consider bail applications and the circumstances under which bail is
> granted, Congress hoped to "give the courts adequate authority to
> make release decisions that give appropriate recognition to the
> danger a person may pose to others if released." S.Rep. No. 98–225,
> at 3, U.S.Code Cong. & Admin.News 1984, p. 3185.

481 U.S. at 742.

On the other side of the scale, the *Salerno* court recognized the strong interest of individuals

in their personal liberty.  *Id.* at 750.  "We do not minimize the importance and fundamental nature

of this right.  But, as our cases hold, this right may, in circumstances where the government's

interest is sufficiently weighty, be subordinated to the greater needs of society."  *Id.* at 750-51.

The Court went on to hold:  "When the Government proves by clear and convincing evidence that

an arrestee presents an identified and articulable threat to an individual or the community, we

believe that, consistent with the Due Process Clause, a court may disable the arrestee from

executing that threat."  *Id.* at 751.

As Magistrate Judge Sison noted, the United States moved for pretrial detention of Tiner

under 18 U.S.C. § 3142(f)(2)(B).  R. 33 at p. 2.  This section permits the Government to seek

detention where there is "a serious risk that such person will obstruct or attempt to obstruct justice,

or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). As the judge observed, these factors are relevant to the court's determination on the issue of pretrial detention. R. 33 at p. 5.

At the detention hearing, the United States presented as exhibits[6] the four text messages, sent by Tiner[7] to victim/witness K.G.1, which form the basis of Counts 3 through 6. In these texts, Tiner made the following threats: (1) "If you want to do the right thing . . . . make THIS right . . . and calm the murderous rage i have growing inside GIVE ME MY MONEY BACK!!!" (Govt. Exh. 1); (2) "[I]f you say sometime (sic) to piss me off . . . all loyalty is out the window and ill (sic) come find you and end you" (Govt. Exh. 2); (3) "If you do not give me my money back I (sic) gave you in my account and we lose all that money . . . . anybody related to you . . . work with you . . . friends with you . . . . lives with you . . . knows you . . . etc will pay the consequences of you f****** me . . . . . . then and only then when they think you have experienced enough loss and pain will they look for you!!!!!" (Govt. Exh. 3); and (4) a text message which contained a picture of a police car and a news story headline reading: "Driver flips car after being shot," and followed by a text message which stated: "Heres (sic) a lil hint for you!!!! . . . . and remember our talk keep your mouth quiet!!! here on out . . . . ." (Govt. Exh. 4).

The content of these texts is bone-chilling. The statute requires a court to consider whether there is a serious risk that a defendant will threaten or intimidate a prospective witness. As these

---

[6]     The United States has asked Magistrate Judge Sison's chambers to provide this Court with the original exhibits presented at the detention hearing, as well as the Pretrial Services Report, which lists Tiner's prior criminal history. The United States will also deliver copies of all exhibits to this Court's chambers.

[7]     As the undersigned Assistant United States Attorney ("AUSA") explained at the hearing, these texts are linked to Tiner by K.G.1's statements that he received from Tiner, as well as evidence showing that the texts were sent from a cellular telephone number registered to Tiner. Det. Tr. 8.

texts conclusively establish, Tiner **actually** threatened and intimidated victim/witness K.G.2 on four separate occasions.  Specifically, Tiner threatened to murder K.G.1.[8]

The defense argue that there is no evidence that Tiner acted upon these threats.  R. 45 at p. 5.  While this is true, the statute does not require the Government to prove that a defendant will act upon his threats.  *See* 18 U.S.C. § 3142(f)(2)(B).  The statute lists "threaten, injure, or intimidate" in the disjunctive, meaning that a serious risk of any of these acts weighs in favor of detention.

Even if a defendant does not act upon them, threats to harm witnesses are serious actions which the courts must try to prevent.  Threats exact extreme emotional tolls upon their victims.  And because they have the potential to dissuade witnesses from testifying, threats have the serious potential to undermine the truth-finding function of the judicial system.

The defense also argues that Judge Sison should have ignored the threats to K.G.1, because they occurred in 2017, approximately three years prior to the detention hearing.  R. 45 at p. 5.  As noted above, however, the Government presented evidence of a much more recent threat made by Tiner.  Government Exhibit 20 was an investigative report of interview of victim/witness R.G. regarding an encounter R.G. had with Tiner on October 17, 2020.  The report reads, in part:  "G. asked Tiner if Tiner was threatening G.  Tiner told G. that he is not currently upset with G.  Tiner told G. when he gets upset, people die."  Govt. Exh. 20.

The defense argues that the court erred by relying on this evidence, because it was presented through a Memorandum of Interview and the witness did not testify at the detention

---

[8]    The defense argues that there was no evidence that K.G.1 "was actually afraid or fearful of Tiner."  R. 45 at p. 5.  The statute, however, does not include "actual fear" as a factor the Government must establish.  Regardless, K.G.1 has expressed to federal agents that he is fearful of Tiner.  If this Court chooses to re-open the evidentiary hearing in this matter, the United States anticipates that it would be able to obtain an affidavit from K.G.1 establishing this fact.

hearing.[9]   However, because the Federal Rules of Evidence are not applicable at detention hearings, the judge was permitted to rely upon this evidence, provided that he found it to be reliable.  *See* Fed. R. Evid. 1101(d)(3).  And, in the present case, Judge Sison found that the incredible similarity among Tiner's threats, including those made to K.G.1, R.G., and the six witnesses who swore out petitions for orders of protection, provided sufficient indicia or reliability. *See* R. 33 at p. 8.

As noted above, in determining that there is a serious risk that Tiner will threaten witnesses, Judge Sison also relied on the six petitions for orders of protection the Government presented as exhibits.  R. 33 at 7 – 8.  In these petitions, the victims/witnesses stated:  (1) "Emmitt Tiner showed up at my place of employment . . . and requested that I pay him money or he would hunt me and my family down to cause bodily harm or more." (Govt. Exh. 14 at p. 2); (2) Tiner had "enter[ed] on my property with my Daughter in Law trying to provoke my son into doing something." (Govt. Exh. 15 at p. 2); (3) "Emmitt Tiner showed up at my residence[10] . . .  and he asked me about some money he alleges I owe him (which I do not owe him anything) and threatened to blow me up or [B.S.] and anyone on the way as well as my children if he seen us in my car.  He also said he would go get his 'homies' to watch me if we get in the car or if he found us in the car he would blow us up in it." (Govt. Exh. 16 at p. 3); (4) B.S. repeats the same allegations contained in K.G.2's petition quoted above. (Govt. Exh. 17 at p. 6); (5) "Me and Mr. Tiner had words last Sunday.  On the 2nd he walk up to me and started talking about for me to keep his name out of his mouth and told me

---

[9]      Like the judge, defense counsel erroneously concluded that this incident involved victim/witness K.G.1. As noted above, however, the October 17, 2020, threat actually involved R.G., a separate victim/witness.

[10]      This is the threat that was made to K.G.2.  The defense states that none of the individuals who submitted the petitions for orders of protection have any relationship to the charges in the indictment.  R. 45 at pp. 5 – 6.  This is incorrect.  Although this fact was not brought up at the detention hearing, K.G.2 is expected to testify regarding the Health Care Fraud counts.  K.G.2 was employed by Tiner to act as his Personal Assistant under the Health Care Program referenced in the indictment.  K.G.2 told federal agents that Tiner's participation in this program was fraudulent and he had no need for a Personal Assistant.

that there's going to be problem if I say anything about him to the court system." D.Y. also stated that Tiner had beaten his minor child. (Govt. Exh. 18 at p. 3); and (6) "Verbal and physical assault resulting in a court appearance on 01/19/2017.  Courtroom 108 at 08:45 a.m. 01/19/17:  At court on 01/19/17, Emmit Tiner threatened [D.M.]'s life.  He said 'I will forgive you after I kill your ass.'" (Govt. Exh. 19 at p. 2).

The defense argues that these petitions are not reliable, because several did not result in final orders of protection, and Tiner was successful in getting some of the petitions dismissed. R. 45 at p. 5 – 6.  But contrary to the defense's argument, this does not mean that the petitions are unreliable.  As this Court knows, there are many reasons why a petition will not result in a full and/or final order of protection.  Perhaps the victim/witnesses merely wanted to create a record with the courts, just in case Tiner decided to follow through with his threats.  Perhaps they thought the petitions would be enough to deter Tiner from harming them and their families, and they did not want to provoke Tiner with further litigation.

Regardless of why the petitions did not result in final orders, one fact is clear:  at various times over the last three years, each of these victim/witnesses were so concerned about their safety, and the safety of their families, that they petitioned the legal system for orders of protection against Tiner.  And each victim/witness submitted a sworn statement, under oath, setting forth the threats that Tiner had made to him or her.

As Judge Sison noted, when combined with the threats by Tiner contained in the other Government Exhibits, the allegations contained in the petitions for orders of protection "paint a consistent narrative of the Defendant making threats to accomplish his various aims . . . ."  R. 33 at p. 8.  These exhibits demonstrate that Tiner has threatened to murder and/or injure eight separate

individuals.  Taken together, this is clear and convincing evidence that Tiner is a danger to the community and specific persons within the community.

The defense argues that Judge Sison erred by relying upon the strength of the Government's evidence against Tiner on the various charges in the indictment.  R. 45 at 6 – 7.  The defense contends that the strength of the Government's evidence goes only to the issue of whether Tiner is a flight risk, and not to the issue of whether he is a danger to the community.  This argument, however, misconstrues the Bail Reform Act.

Title 18, United States Code, Section 3142(g) states:  "The judicial officers shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required **and the safety of any other person and the community,** take into account the available information concerning . . . (2) the weight of the evidence against the person; . . ." (emphasis added).  Thus, the statute itself does not limit the "weight of the evidence" factor to only flight risk.

The "weight of the evidence" factor is a useful tool for courts to use when balancing the liberty interests of individual defendants against the need to protect society from dangerous individuals.  When an experienced judge can see that the evidence against an individual is very strong, a decision to restrict that individual's liberty is less onerous.  The scales of justice weigh in favor of detaining a dangerous individual when that individual will, in all likelihood, be convicted and sentenced to prison.  The fact that time spent in pretrial detention will ultimately be credited against any prison sentence imposed also lessens the harshness of a detention order.

According to the defense, the Magistrate Judge also erred by weighing Tiner's lengthy criminal history against him.  R. 45 at p. 7.  The defense notes that the majority of Tiner's criminal history is for "fraud, theft, and deceptive practices," and [a]ny charges for violent offenses were

either dismissed and/or date back to the 1980's and 1990's." *Id.* Once again, the argument of the defense misses the mark.

The Bail Reform Act specifically directs district courts to consider a defendant's criminal history. *See* 18 U.S.C. § 3142(g)(3)(A). As this Court knows, a defendant's criminal history demonstrates his willingness to confine his conduct to the restrictions of the law. This factor speaks volumes on the issue of whether a court can expect a defendant to follow its directives while on bond.

The fact that Tiner's provable violent conduct is somewhat dated does not alleviate the concern about whether he is a danger to the community and specific individuals. As discussed above, Tiner has threatened to kill and/or harm numerous individuals within the past couple of years. His convictions for past violent behavior demonstrates that Tiner has a tendency to act upon his anger.

As it did at the detention hearing, the defense argues again that Tiner's health conditions warrant pretrial release. R. 45 at pp. 7 – 8. The defense primarily points to the "severe back and spinal injuries" Tiner sustained in 2010 while he was in prison. *Id.* at 8. As discussed above, however, Tiner attempted to exaggerate the extent of his back injury by forcing the United States Marshal's Service to push him around in a wheelchair at his detention hearing. R. 33 at p. 10. As Judge Sison noted, the United States presented video recording exhibits which showed Tiner, dancing, attending football games out-of-state, driving, carrying heavy items, and walking. Govt. Exh. 6, 8, 9A, 9B, 21A, 21B, 21C, 21D, & 21E. All of these videos were taken after Tiner's 2010 prison accident. The videos of Tiner walking and lifting objects out of his vehicle were taken on the day before, and the morning of, his November 19, 2020, arrest. Govt. Exh. 21A, 21B, 21C, 21D, & 21E. *See also* Det. Tr. 19 – 20. In light of this evidence, it is little wonder that Judge

Sison saw through the wheelchair charade and held that Tiner's medical conditions did not require pretrial release.

The defense claims that Tiner needs to have a medical device in his back "regularly maintained and recalibrated." R. 45 at p. 8. The defense also states that Tiner is required to take several medications for his back, as well as for a heart condition and high blood pressure. *Id.* There is simply no reason, however, why the medical staff at the jail where Tiner is detained cannot administer his daily medications. In addition, the Marshal's Service historically has transported detained defendants to specialists for necessary medical care that they cannot get at the jails. The defense has not explained why the Marshal's Service would be unable to transport Tiner for any prescribed maintenance on his back device.

The defense asks this Court to release Tiner due to the COVID-19 pandemic which is currently afflicting the country. R. 45 at 8 – 9. The United States acknowledges that COVID-19 is a very serious concern for everyone throughout the nation. The Government also acknowledges that the virus creates particular problems for jails and correctional institutions, where, by the very nature of their missions, it is difficult to keep residents socially distanced. Under the particular facts of this case, however, which involve a Defendant who has threatened to kill and/or harm eight separate individuals over the past few years, the need to protect the public and the witnesses from this individual simply outweighs the generalized concerns about the pandemic.

Further, it does not appear that Tiner has any of the specific health conditions that the Centers for Disease Control ("CDC") has determined place individuals at higher risk of severe complications if they contract COVID. Spinal injuries do not appear on the CDC's list of known risk factors. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

13

conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.  Certain heart conditions, such as heart failure, coronary artery disease, and cardiomyopathies, do appear on the list.  *Id.*  But the defense has not indicated that Tiner is suffering from one of these specific conditions.  In addition, although Tiner alleges he has high blood pressure, the CDC has only identified hypertension as a condition that *might* lead to increased risk.  *Id.*

The defense has also indicated that it will be easier for counsel to review discovery with Tiner if he is released on bond.  R. 45 at pp. 9 -10.  The United States acknowledges that review of discovery will be somewhat more difficult with Tiner detained.  In order to accommodate the defense, however, the Government has agreed to create a separate set of discovery (which does not contain Personal Identifying Information "PII").  *See* R. 35 at p. 5.  Defense counsel will be permitted to leave this copy at the jail for Tiner to review on his own.  In addition, defense counsel will be permitted to review and discuss any discovery materials that do contain PII with his client, so long as he does not provide the PII itself to Tiner.

The defense argues that there are conditions of release that could be established that would ensure the safety of the community and the witnesses.  R. 45 at p. 9.  Specifically, the defense suggests that the Court impose a condition of home detention, with electronic monitoring, and an order that Tiner have no contact with any witnesses.  *Id.*  However, Tiner's history of threatening individuals, including those who may testify against him, and his lifelong disregard for the law, should give this Court serious pause on the question of whether Tiner will abide by any conditions imposed by this Court.

Further, as Judge Sison explained, Tiner will still have the ability to concoct and execute his schemes while on home detention.  R. 33 at p. 9.  And he will still have the ability to threaten

14

and intimidate witnesses.  After all, Tiner's threats to K.G.1 were sent via text.  How will home confinement prevent Tiner from threatening witnesses via electronic means?  If his phone is taken away, what's to prevent him from using the phones of other residents of the house?  If all phones are removed from the house, what's to prevent him from using other electronic means to contact the witnesses, such as email?  Can internet access to the house be shut down?  Will the other residents of the house agree to this condition?  In addition, as the indictment and the evidence presented at the detention hearing demonstrate, Tiner often uses co-conspirators for purposes of accomplishing his criminal objectives.  How will home confinement prevent Tiner from enlisting accomplices to threaten and harass the witnesses in this case?

In summary, Judge Sison was simply correct when he found that no condition or combinations of conditions would reasonably assure the safety of the community and the witnesses if Tiner is released.

### III.  CONCLUSION

WHEREFORE, for the reasons stated above, the United States of America respectfully requests this Honorable Court to deny Defendant Tiner's Motion to Revoke Detention Order.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney


s/ Scott A. Verseman

SCOTT VERSEMAN
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700
Fax:  (618) 628-3720

15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20 CR 30166-SPM |
| | ) | |
| EMMITT T. TINER, and | ) | |
| MATISSIA S. HOLT, | ) | |
| | ) | |
| Defendants. | ) | |

**Certificate of Service**

I hereby certify that on January 20, 2021, I caused to be electronically filed the foregoing "United States' Response to Defendant Tiner's Motion to Revoke Detention Order" to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all attorneys of record.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

*s/ Scott A. Verseman*

SCOTT VERSEMAN
Assistant United States Attorneys
Nine Executive Drive
Fairview Heights, IL 62208
scott.verseman@usdoj.gov
(618) 628-3700
Fax: (618) 628-3720