IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 20 CR 30166-SPM-01 |
| | ) |
| EMMITT T. TINER, | ) |
| | ) |
| Defendant. | ) |

**UNITED STATES' RESPONSE TO DEFENDANT'S TINER'S MOTION TO SUPPRESS**

The United States of America, by and through its attorneys, Steven D. Weinhoeft, United States Attorney for the Southern District of Illinois, and Scott A. Verseman, Assistant United States Attorney for said district, respectfully submits the following response to Defendant Tiner's "Motion to Suppress Evidence Obtained During Unlawful Search of Residence and Vehicle":

**I. Relevant Background**

On November 18, 2020, a 54 count indictment was returned charging Defendant Emmitt Tiner with various violations of federal law. The specific offenses charged include Extortion (18 U.S.C. § 1951), Interstate Communications with Intent to Extort (18 U.S.C. § 875(b)), Wire Fraud (18 U.S.C. § 1343), Mail Fraud (18 U.S.C. § 1341), Health Care Fraud (18 U.S.C. § 1347), Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)), Monetary Transactions in Criminally Derived Property (18 U.S.C. § 1957), Aggravated Identity Theft (18 U.S.C. §  1028A), Material Misstatement of Fact to a Domestic Financial Institution (31 U.S.C. § 5324(a)(2)), Use of a Social Security Number of Another Person in Violation of Law (42 U.S.C. § 408(a)(8)), and False Representation of a Social Security Number (42 U.S.C. § 408(a)(7)(B)).  Tiner's wife, Matissia Holt, was charged in

the Healthcare Fraud, Money Laundering, and Monetary Transactions in Criminally Derived Property counts.

The allegations contained in Count One describe generally how Tiner conducted his Mail Fraud, Wire Fraud, and Extortion related offenses. R. 1 at p. 1.[1] Specifically, Tiner targeted as his victims[2] individuals who owned small businesses, or otherwise had access to large amounts of money. R. 1 at p. 2. He obtained as much money as possible from these victims via false and fraudulent pretenses, representations, and promises. *Id.* Tiner also attempted to obtain money from the victims by manipulating them and instilling fear in them. *Id.* As a part of these manipulation and fear tactics, Tiner often solicited the victims to engage in some type of criminal activity, or falsely told the victims that he had engaged in criminal activity on their behalf. *Id.* Then, Tiner attempted to obtain additional funds from the victims by threatening to expose their alleged involvement in these criminal activities to law enforcement and other parties. *Id.*

On the same date that the indictment was returned, the Government also sought and obtained a search warrant for Tiner's residence at 210 Knollhaven Trail in O'Fallon, Illinois. 20-MJ-8173-GCS.[3] FBI Special Agent Adam Hoberg submitted a 30 page affidavit in support of his application for this search warrant. *See* 20-MJ-8173-GCS, Search Warrant Application and Supporting Affidavit. In his affidavit, Agent Hoberg provided a detailed description of much of the evidence that had been gathered to that point establishing that Tiner and his Holt had committed the various federal offenses.

---

[1]  All documents contained in the official district court record of this case are denoted "R." and followed by the applicable document number, and, if relevant, page number.

[2]  The indictment contains specific counts relating to victims with the individuals K.G. and R.G. Tiner also used this scheme to victimize a third individual with the initials B.R. B.R. is now deceased.

[3]  The search warrant (and supporting affidavit) at issue in this motion to suppress is contained in the district court's records at the following Magistrate Number: 20-MJ-8173-GCS.

The evidence relating to a victim with the initials R.G. illustrates how Tiner conducted his fraud/extortion scheme. This evidence also demonstrated the need for a search warrant for Tiner's residence. R.G. told the FBI that approximately two years earlier, Tiner came to his business in Fairview Heights, Illinois, and began extorting and defrauding him. *See* 20-MJ-8173-GCS, Search Warrant Application and Supporting Affidavit, at p. 14, ¶¶ 78 - 80. Tiner claimed to have information that R.G. had had an extramarital affair with a woman with the initials of T.S. *Id.* at ¶ 80. Tiner threatened to turn this information over to R.G.'s wife if R.G. did not pay him a substantial sum of money. *Id.* at ¶ 82. R.G. agreed and made an initial payment to Tiner of $225,000. *Id.* at 82. After this initial payment, Tiner made additional demands for money and R.G. paid him additional sums. *Id.* at ¶ 83.

After a while, Tiner changed the way that he extorted money from R.G. *Id.* at ¶ 84. Tiner told R.G. that his "crew" had broken into a home in Collinsville, Illinois, for the purpose of recovering evidence of R.G.'s alleged affair with T.S. *Id.* According to Tiner, however, when his crew broke into the residence there were certain people present and the crew murdered these individuals.[4] *Id.* To cover up these murders, Tiner and the crew drove to Las Vegas, Nevada, and buried the bodies in the desert. *Id.* Tiner claimed that he had paid the crew $700,000 for these efforts and demanded that R.G. reimburse him for this expense. *Id.* Tiner threatened to turn the evidence of the murders over to law enforcement, and to implicate R.G. in the murders, if R.G. did not pay him. *Id.* at ¶¶ 84, 87. On several additional occasions, Tiner extorted additional funds from R.G. by threatening to implicate him in these alleged murders.

---

[4] At trial, the Government's evidence will establish that there were no murders. Tiner completely fabricated this story in order to obtain additional funds from R.G. Because Tiner used false statements and fraudulent pretenses to obtain funds from R.G., his actions also constitute a fraud scheme.

In furtherance of his extortion/fraud scheme, Tiner created, and sent to R.G., several video recordings. *Id.* at ¶ 87. These recordings were designed to trick R.G. into believing not only that Tiner had evidence that would establish the affair with T.S., but that he also had evidence relating to the murders that he was prepared to disclose to the authorities. These videos included: (1) a staged meeting with T.S. in which she claims to be pregnant by R.G. (*Id.* at ¶ 88); (2) a video in which Tiner "confesses" to a social media host that R.G. had arranged for certain individuals to be murdered and that he (Tiner) had assisted in disposing of the bodies (*Id.* at ¶¶ 88 – 92); (3) video of Tiner directing a backhoe operator to move a large blue plastic bin (purportedly containing the dead bodies)(*Id.* at ¶ 90); (4) a video addressed to a Lieutenant Ray Spencer of the Las Vegas Police Department in which Tiner claims that he disposed of three bodies for an individual who had arranged to have them murdered (*Id.* at ¶¶ 94 – 96); and (5) four videos where Tiner is purportedly being questioned about the murders by former Illinois Attorney General Lisa Madigan.[5] (*Id.* at ¶¶ 98 – 100).

In the video addressed to Lieutenant Ray Spencer, Tiner shows various pieces of "evidence" which purportedly establish the murders and R.G.'s involvement in them. *Id.* at ¶ 95. These items include: (1) a recording device with a recording of his first meeting with R.G.; (2) paperwork T.S. brought to his house evidencing her pregnancy and identifying R.G. as the father of her baby; (3) another recording of a meeting with R.G.; (4) copies of checks received from R.G.; (5) a cassette of a recording of a meeting with R.G. where the burning of the bloody clothes was discussed; (6) a recording of a meeting with R.G. at a storage facility; (7) recordings of additional meetings with R.G.; (8) the "bloody clothes" allegedly taken off the dead bodies; (9) a blue plastic

---

[5] One of these videos purports to show Tiner taking a polygraph exam. Two of the videos purport to show Tiner being questioned by Lisa Madigan before a Cook County, Illinois, grand jury.

bin that the clothes were stored in; (10) the plastic sheets/tarps that the bodies were supposedly originally wrapped in; and (11) a black canvas bag which purportedly contained the evidence that the men hired by R.G. were attempting to recover from T.S., including recordings of her sexual encounters with R.G., and notebooks of information relating to their affair. *Id.*

Likewise, in one of the videos where he was purportedly questioned by Lisa Madigan, Tiner shows photographs of a number of "exhibits" which he claims corroborate his story. *Id.* at 100. The photographs shown by Tiner on this video purportedly show: (1) a yellow envelope that purportedly contains hotel receipts showing the "individual's" encounters with his mistress; (2) another yellow envelope containing documents establishing the pregnancy of the mistress; (3) a recording of the mistress' sexual encounters with the individual; (4) two tape cassettes and a tape recorder containing recordings of conversations where the individuals solicited Tiner to dispose of dead bodies in return for large monetary payments; (5) pictures of the three dead bodies; (6) black and blue storage bins which purportedly contain the plastic that was used to cover the bodies and the bloody clothes taken off the bodies; and (7) photos of Tiner purportedly showing him supervising the burial of the bodies in Las Vegas. *Id.* Tiner also tells "Madigan" that he has recordings of 6 to 10 additional recordings which implicate the "individual" in the murders. *Id.*

In Attachment B to his search warrant application, Agent Hoberg requested authority to search for and seize the items referenced in the "Lieutenant Ray Spencer" and "Lisa Madigan" videos. *See* 20-MJ-8173-GCS, Search Warrant Application and Supporting Affidavit, at Attachment B, ¶¶ 1 - 11.

Agent Hoberg's affidavit provided detailed information regarding Tiner's use of electronic devices in furtherance of his various federal crimes. Obviously, video recorders, computers, and/or cellular telephones were used to produce the extortion videos referenced above. Tiner also

5

frequently used cellular telephones to communicate false information and demands to his victims. For example, the interstate communications with intent to extort charged in Counts Three through Six of the indictment were text messages that Tiner sent to a victim with the initials K.G. (identified in the search warrant affidavit as "Cooperating Witness" or "CW").  20-MJ-8173-GCS, Search Warrant Affidavit, at p. 12, ¶¶ 66, 67.  Tiner also sent text messages to R.G., and had phone conversations with him, during his extortion/fraud of R.G.  *Id.* at ¶¶ 104, 106, 107.  In addition, cell site information placed Tiner's cell phone in the vicinity of a break-in of victim B.R.'s vehicle.[6]  *Id.* at ¶¶ 32 – 35.  Phone records also show that Tiner's phone was in repeated communication with B.R.'s phone while B.R. withdrew $375,000 of her retirement funds from Dieterich Bank on February 12, 2016.  *Id.* at ¶¶ 19, 20.  Further, Tiner used some type of electronic device(s) to take photographs relating to his criminal activities and to save those photos in his Google account.  *See Id.* at ¶¶ 22, 31, 36.  Finally, Tiner used an electronic device(s) to conduct internet searches which furthered his fraud scheme.[7]  *See Id.* at ¶¶ 75.

The indictment contains a forfeiture allegation that seeks forfeiture of various funds, vehicles, and real property purchased with the proceeds of Tiner's extortion/fraud scheme.  The two pieces of real property named in the forfeiture allegation are:  (1) Tiner's and Holt's residence at 210 Knollhaven Trail in O'Fallon; and (2) a residence Tiner and Holt were building at 1405

---

[6] During this incident, B.R. reported to police that jewelry had been stolen from her vehicle while it was parked at Hollywood Casino in Maryland Heights, Missouri. *Id.* at ¶ 32. B.R. subsequently submitted a claim to her insurance company for these stolen items. *Id.* at ¶ 45. This incident appears to be part of Tiner's pattern of persuading, or attempting to persuade, his victims to engage in illegal acts so that he could later use these illegal acts to extort more money from the victims.

[7] Tiner was ordered to pay $107,500 in restitution to a victim of a prior fraud scheme he was convicted of in Kane County, Illinois. *Id.* at ¶ 6. Records obtained from Google showed that Tiner had searched the internet for information regarding whether his Kane County victim was still alive, and whether a restitution order expires on the death of the victim. *Id.* at ¶ 76. Tiner's desire to avoid paying restitution in this prior fraud case establishes motive for his use of other persons' social security numbers to conduct financial transactions, and his laundering of his extortion/fraud proceeds.

Pausch Road in O'Fallon. The United States has filed *lis pendens* against these properties with the St. Clair County Recorder's Office.

One of the vehicles named in the forfeiture allegation is a 2020 Ford 350 Crew Cab XLT pickup truck. In addition to issuing the search warrant for 210 Knollhaven on November 18, 2020, the court also issued seizure warrants for the pickup, other vehicle, and bank accounts named in the proceeds section of the forfeiture allegation.[8] The search and seizure warrants were all executed on November 19, 2021.

Various items and documents were seized during the execution of the warrants. The FBI report of the search and the evidence log are attached as Exhibits 1 and 2. The items seized during the searches which are relevant to the motion to suppress include: (1) the "evidence" Tiner mentioned during his extortionate videos, including the plastic/tarp, with fake blood, used to cover the "dead bodies," the blue plastic bin and clothing from the "dead bodies," and the black canvas bag; (2) six cellular telephones, five computers and electronic tablets, and various recording devices, recordings, and electronic storage devices; and (3) documents relating to 1405 Pausch Road found in the pickup truck.

## II.  ARGUMENT

### A.  Probable Cause to Search 210 Knollhaven

Tiner first argues that Agent Hoberg's affidavit did not establish probable cause that the items searched for would be located at 210 Knollhaven. R. 78 at p. 4. Tiner avers: "Using a half-hearted method of speculation and elimination, Special Agent Hoberg stated that his training and

---

[8]  These seizure warrants are contained in this Courts records at the following Magistrate Numbers: 20-MJ-8174-GCS; 20-MJ-8175-GCS; 20-MJ-8176-GCS; and 20-MJ-8177-GCS. The seizure warrant for the pickup truck is at 20-MJ-8175-GCS.

experience was enough to say items would be found at the residence." *Id.* Contrary to Tiner's arguments, the reasonable inferences Agent Hoberg drew from the facts were more than sufficient to establish probable cause for the search of 210 Knollhaven.

Tiner correctly cites *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), for the proposition that "unjustified conclusions are not sufficient to support a finding of probable cause." R. 78 at p. 4. But *Gates* also holds that probable cause must be evaluated by examining the totality of the circumstances. 462 U.S. at 238. The *Gates* court stated: "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

"Warrants may be issued even in the absence of '[d]irect evidence linking criminal objects to a particular site.'" *United States v. Lamon,* 930 F.2d 1183, 1188 (7th Cir. 1991)(*quoting United States v. Jackson,* 756 F.2d 703, 705 (7th Cir. 1985)). *See also United States v. Malin,* 908 F.2d 163, 165 (7th Cir. 1990)("Stallard's complaint did not directly link the marijuana to the house, Direct evidence, however, is not necessary to a probable cause determination."); *United States v. Jones,* 614 F.3d 423, 426 (7th Cir. 2010)(noting that the Seventh Circuit has repeatedly held that, even without direct evidence of drug-related activity at the defendant's residence, participation in drug-trafficking can create probable cause to search that residence). In *United States v. Hicks,* 650 F.3d 1058, 1067 (7th Cir. 2011), the Seventh Circuit observed: "For Detective Armon to have a sufficient factual basis to support probable cause he did not have to know for sure that the weapon was at either residence; Armon's evidence had to create a 'substantial chance' or 'only a probability' that he would find the weapon. *Id.* (*citing United States v. Brack,* 188 F.3d 748, 755 (7th Cir. 1999)).

When assessing whether there is "fair probability" that evidence will be found at a particular location, law enforcement "[o]fficers may 'draw reasonable inferences based on their training and experience in making that determination.'" *United States v. Richards,* 719 F.3d 746, 754 (7th Cir. 2013)(*quoting United States v. Williams,* 627 F.3d 247, 251 (7th Cir. 2010)). Likewise, "a court, in determining whether to issue a search warrant, may draw reasonable inferences, based upon the nature of the evidence and offense, about where evidence is likely to be kept." *Jones,* 614 F.3d at 426. *See also United States v. Carswell,* 996 F.3d 785, 791 (7th Cir. 2021); *United States v. Reichling,* 781 F,3d 883, 889 (7th Cir. 2015); *Lamon,* 930 F.2d at 1188; *Malin,* 908 F.2d at 166.

Agent Hoberg's used reasonable inferences to determine that there was a fair probability that evidence he was seeking would be located at 210 Knollhaven. As noted in the preceding section, Agent Hoberg had reviewed video recordings in which Tiner himself showed, talked about, and stated that he possessed the first 11 items in Attachment B of Hoberg's affidavit. Search Warrant Application and Supporting Affidavit, at p. 26, ¶ 138. Thus, there was no question that these evidentiary items existed.

With regard to the remaining items, Agent Hoberg concluded that, based upon his training and experience, individuals tend to keep those items. *Id.* at ¶ 139. This practice has been approved by the Seventh Circuit in cases such as *Richards* and *Williams*. Further, a comparison of the items in Attachment B with the body of Agent Hoberg's affidavit demonstrates that it was reasonable to believe that Tiner would have those items. For example, Item 14 of Attachment B seeks "[a]ll financial records, including bank statements, records of large purchases, real estate records, and copies of tax returns." Agent Hoberg's affidavit establishes that Tiner laundered the proceeds of his extortion/fraud through bank accounts controlled by Holt, and then used some of those

9

proceeds to conduct real estate purchases. *Id.* at ¶¶ at 111 – 134. Thus, it was reasonable to infer that Tiner would have the types of records described in Item 14. Similar conclusions can be reached by comparing the content of Agent Hoberg's affidavit to the other items listed in Attachment B.

With regard to *where* the items described in Attachment B would be found, Agent Hoberg reasonably deduced that the items would be found at 210 Knollhaven. It is true, as pointed out in the motion to suppress, that Tiner had "prior addresses in the area." R. 78 at p. 4. But Agent Hoberg investigated Tiner's last known address of 541 N 74th in Belleville, and found that Tiner was no longer residing at that address.[9] Search Warrant Application and Supporting Affidavit, at p. 27, ¶ 141. Likewise, as Tiner points out, it is true he "previously had a storage facility." R. 78 at p. 4. Once again, however, Agent Hoberg investigated this and determined that Tiner no longer leased that storage unit. Search Warrant Application and Supporting Affidavit, at p. 27, ¶ 143. Further, Agent Hoberg reported to the court that Tiner had no known employment, and therefore no business premises that could be used to the items in Attachment B. *Id.* at ¶ 142.

Agent Hoberg did his homework in this case. He ruled out the possibility that Tiner controlled other locations where the evidence could be stored. After doing this homework, Agent Hoberg deduced that the only logical place that the evidence could be stored was at Tiner's Knollhaven residence. The deductive process employed by Agent Hoberg in this case resulted in the exact type of reasonable inferences that the Seventh Circuit has held are sufficient to establish probable cause.

---

[9] The residence Tiner and Holt were building at 1405 Pausch Road was never completed. *See* R. 62 at p. 3.

B.      Particularity Regarding Electronic Devices

Tiner next challenges Item 36 of Attachment B of the Search Warrant, which authorized seizure of: "All computers, electronic devices, and cellular telephones found at 210 Knollhaven Trail, O'Fallon, Illinois, and located on the persons of any individuals on the premises . . . at the time of the search." R. 78 at p. 5.  Tiner argues that this item is facially overbroad and violates the particularity requirement of the Fourth Amendment.  Based upon the facts outlined in Agent Hoberg's affidavit, however, this item was not overbroad.

It is true that some courts have found "all electronic devices" language in search warrants to be overbroad.  The case most often cited for this proposition is *United States v. Griffith,* 867 F.3d 1265 (D.C. Cir. 2017).  In *Griffith*, the D.C. Circuit held that a warrant authorizing the seizure of all cell phones and other electronic devices at the defendant's residence was overbroad. *Griffith*, however, is distinguishable from the facts presented by the current case.  Unlike the situation involving Tiner, the D.C. Circuit noted that the search warrant affidavit lacked probable cause because it "conveyed no reason to think that Griffith . . . owned a cell phone.  There was no observation of Griffith's using a cell phone, no information about anyone having received a cell phone call or text message from him. . . ." *Id.* at 1272.  Further, because the warrant authorized the seizure of any cell phones found at the residence, and Griffith shared the residence with his girlfriend (Lewis), and the affidavit "offered no explanation of why Lewis's devices could have been appropriately seized," the D.C. Circuit held that warrant was overbroad. *Id.* at 1276.

In subsequent decisions involving facts closer to the present case, courts have distinguished *Griffith* and upheld search warrants which authorized the seizure of all of the defendant's cell phones and all cell phones located at a particular residence. *See, e.g., United States v. Grinder,* 808 Fed.Appx. 145, 147 (D.C. Cir. 2020)(distinguishing *Griffith* because "the officers knew that

11

Grinder had a cell phone and that he had used it to send incriminating text messages to his wife."); *United States v. Wagner,* 951 F.3d 1232, 1248, n.14 (10th Cir. 2020)(warrant was not overbroad for permitting agents to search for any device that could have been used to make child porn, because defendant had a co-conspirator who was known to be making child porn, and that co-conspirator's identity was unknown).

The specificity requirement of the Fourth Amendment does not require the Government to specifically identify an electronic device to be seized, when the Government is unaware of which specific electronic device was used to commit the offense. In *United States v. Wenzel,* 854 F.3d 957, 961 (7th Cir. 2017), the Seventh Circuit stated: "There is nothing constitutionally problematic in authorizing a search of all such items when there is probable cause to believe that a suspect was clandestinely recording people who used his bathroom. . . ." Likewise, the Ninth Circuit rejected an overbreadth challenge a search warrant in a child pornography case that authorized the seizure of "[a]ny computer or electronic equipment or digital data storage devices that are capable of being used" for child pornography. *United States v. Schesso,* 730 F.3d 1040, 1043 (9th Cir. 2013). In arriving at this conclusion, the *Schesso* court noted: "'Warrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible.'" *Id.* at 1046 (*quoting United States v. Adjani,* 452 F.3d 1140, 1147-48 (9th Cir. 2006)).

Like the warrants in *Wenzel* and *Taylor,* the warrant considered by the Northern District of California in *United States v. Taylor,* 2019 WL 281457 (N.D. Cal. 2019), did not describe the specific computers and electronic devices to be seized. *Id.* at *8. In rejecting Taylor's overbreadth argument, the Northern District of California quoted the following language from *Schesso*: "The government had no way of knowing which or how many illicit files there might be or where they

12

might be stored, or of describing the items to be seized in a more precise manner." *Id.*  Taylor also argued that the agents' seizure of his wife's iPhone demonstrated how impermissibly broad the search warrant was.  *Id.*  The Northern District of California rejected this argument, noting that Taylor and his wife had filed joint tax returns for a business that was involved in Taylor's fraud scheme.  *Id.*  Combined with the other information in the affidavit, the district court found that the wife's involvement in filing the joint tax returns provided sufficient probable cause to search her cell phone.  *Id.*

In the present case, Agent Hoberg's affidavit described multiple ways that Tiner was using electronic devices in furtherance of his extortion/fraud scheme.  These included having telephone conversations with his victims, sending text messages to his victims, creating extortionate video recordings, and using the internet to search for information related to his scheme.  At the time of the search warrant application, the Government was aware of the phone number of the cell phone related to some of the texts and phone calls.  However, the Government had no way of knowing which other electronic devices at Tiner's residence had been used by him to commit these crimes.

The Government was also aware that Tiner had enlisted the aid of co-conspirators to assist him in some of the aspects of his federal offenses.  Agent Hoberg's affidavit details the participation of Tiner's wife, Matissia Holt, in laundering the proceeds of the extortion/fraud scheme.  In addition, as noted above, Tiner's extortion videos involved several other people, including the videographer(s) and the actors and actresses playing the parts in the videos, such as the roles of Lisa Madigan and her assistants. Further, one video purports to show a picture of three dead bodies.  Because the murders were fake, this meant that the photo was staged and the three "bodies" were individuals who had agreed to assist Tiner.  Who were all of these people who assisted Tiner with his extortion/fraud?  Were they additional members of Tiner's family?  Did

they use their electronic devices, or other electronic devices located at Tiner's residence, to assist him with his scheme? Similar to the situations in *Schesso* and *Taylor*, the Government had no way of knowing the answers to these questions at the time Agent Hoberg applied for the search warrant. Under the facts of this case, a search warrant authorizing the seizure of "all electronic devices" found at the residence is not overbroad.

If this Court does determine that the "all electronic devices" clause was overbroad in this case, the inquiry does not end at that point. Because the officers seized the electronic devices pursuant to a warrant issued by a United States Magistrate Judge, this Court must consider whether the officers reliance on that warrant makes the evidence admissible under the "good-faith" exception to the exclusionary rule established by *United States v. Leon,* 468 U.S. 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See* United States v. Eggerson, 999 F.3d 1121, 1125-26 (8th Cir. 2021)(applying good-faith exception to warrant which authorized search of any cell phones found in defendant's house or car); *United States v. Taylor,* 855 Fed.Appx. 839, 840-41 (3d Cir. 2021)(applying good-faith exception and stating: "Although a warrant allowing seizure of 'any and all cellular telephones' may be overbroad, this record supports a finding that the warrant was obtained and executed in good faith.")

In the recent decision of *United States v. Matthews,* __ F.4th __, 2021 WL 3821849, (7th Cir. 2021), the Seventh Circuit discussed at length the reasoning behind the good-faith exception and the standards for applying it:

> To tailor this exclusionary rule to the harm it seeks to prevent [police misconduct], the Supreme Court held in *Leon* that, despite the exclusionary rule, evidence obtained in violation of the Fourth Amendment is admissible if the officer who conducted the search reasonably relied on a warrant. . . . The determination of reasonableness, and therefore good faith, is an objective inquiry. . . . Although it is the Government's burden to demonstrate that the officer was acting in objective good faith, an officer's decision to

14

> obtain a warrant is *prima facie* evidence of his good faith. . . . We therefore presume that an officer with a warrant was acting in good faith, and the defendant's burden is to rebut that presumption.

*Id.* at *3. The *Matthews* court further held that, to overcome his burden on the issue of good-faith, a defendant must establish one of the following four situations: "(1) the affiant misled the magistrate with information the affiant knew was false or would have known was false but for the affiant's reckless disregard for the truth; (2) the magistrate wholly abandoned the judicial role and instead acted as an adjunct law-enforcement officer; (3) the affidavit was bare boned, 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) the warrant was so facially deficient in particularizing its scope that the officers could not reasonably presume it was valid." *Id.* at *4 (*quoting United States v. Rees,* 957 F.3d 761, 771 (7th Cir. 2020) and *Leon,* 468 U.S. at 923).

Tiner has not established any of these four circumstances in the present case. Tiner does not allege, and presents no evidence establishing, that Agent Hoberg misled the Magistrate Judge. Likewise, there is no allegation or evidence that Magistrate Sison abandoned his judicial role in authorizing the search warrant for Tiner's residence. Agent Hoberg's affidavit was anything but "bare boned"; it is 30 pages long and sets forth a tremendous amount of detail about Tiner's criminal activities. Finally, the warrant was not so facially deficient that a law enforcement officer could not presume it was valid. As demonstrated by the discussion above, numerous courts have upheld similar search warrants that authorized seizure of "all electronic devices." Under these circumstances there is simply no way that Agent Hoberg could have determined that the warrant was facially deficient.

Agent Hoberg and the other law enforcement officers involved in this case executed, in good faith, the search warrant issued by Magistrate Judge Sison. Because the good-faith exception

is applicable, this Court should not suppress the evidence obtained pursuant to the "all electronic devices" portion of the search warrant.

Finally, the Seventh Circuit has determined that when one provision of a search warrant is determined to be impermissibly overbroad, the overbroad provision can be severed, and the items obtained pursuant to the valid portions of the warrant can be admitted into evidence. *United States v. Klebig,* 228 Fed.Appx. 613, 617-18 (7th Cir. 2007); *United States v. Reed,* 726 F.2d 339, 342-43 (7th Cir. 1984). In *Reed,* the court stated: "Even if 'proof of residency' as the object of a search were vague and overbroad, however, only that much of the June 5, 1979, warrant would fall. The search for cocaine would remain valid as stated with sufficient particularity and severable from any invalid search." 726 F.2d at 342.

If this Court finds that the "all electronic devices" provision of the warrant is overbroad, and the good-faith exception does not apply, it is not necessary to exclude all evidence seized pursuant to warrant. Under *Klebig* and *Reed*, the "all electronic devices" provision should be severed, and only the evidence seized pursuant to that portion of the warrant should be excluded.

C.     Search of Pick-Up Truck

Finally, Tiner argues that the search of his pick-up truck was "plainly unconstitutional." R. 78 at p. 5. In support of this position, Tiner points out that the warrant did not mention that any vehicles would be searched. *Id.* Contrary to Tiner's argument, the search of the pick-up truck was justified as: (1) part of the search of 210 Knollhaven Trail premises; and (2) an inventory search. Further, the evidence seized from the pick-up is admissible under the inevitable discovery doctrine.

When they arrived at 210 Knollhaven Trail on the morning of November 19, 2021, federal law enforcement officers found, parked in the driveway of the residence, the 2020 Ford 350 Crew Cab XLT pickup truck for which the court had issued a seizure warrant. Knowing that the vehicle

was going be seized pursuant to that warrant, and with the FBI's Asset Forfeiture person on site, the agents conducted a search of the vehicle. Their justifications for searching the truck were: (1) the pick-up was located on the premises of 210 Knollhaven Trail, for which they had a search warrant; and (2) because the vehicle was going to be seized pursuant to the seizure warrant, FBI policy required an inventory search to be performed. During the search of the pick-up truck, the agents found and seized documents relating to the home that Tiner and Holt were constructing at 1405 Pausch Road.

In *United States v. Percival,* 756 F.2d 600, 611-12 (7th Cir. 1985), the defendant argued that the search of a third party's automobile, which was located in his garage when a search warrant was executed, exceeded the scope of the warrant. In considering this question, the Seventh Circuit noted that a search warrant authorizes law enforcement officers to open closets and cabinets, and also suitcases and handbags, that they come across while executing search warrants for residences. *Id.* at 612. The court then concluded: "We therefore agree with other courts that have addressed this issue and hold that a search warrant authorizing a search of particularly described premises may permit the search of vehicles owned or controlled by the owner of, and found on, the premises." *See also United States v. Evans,* 92 F.3d 540, 543-44 (7th Cir. 1996)(applying *Percival* to uphold search of defendant's car, which was located in defendant's garage when search warrant was executed, and stating: "It seems to us that a car parked in a garage is just another interior container, like a closet or a desk.")

In the present case, the law enforcement officers had a warrant to search the premises of 210 Knollhaven Trail. The 2020 Ford 350 Crew Cab XLT pickup truck was located on these premises, specifically in the driveway, when the search warrant was executed. Under the holdings

of *Percival* and *Evans,* the warrant for 210 Knollhaven extended to vehicles located on that premises. Therefore, the search of the pickup truck did not exceed the warrant.

Further, because the pickup truck was going to be seized, and was in fact seized, that day, the agents were authorized to perform an inventory search of that vehicle. "Inventory searches constitute a well-recognized exception to the warrant requirement and are reasonable under the Fourth Amendment." *United States v. Cartwright,* 630 F.3d 610, 613 (7th Cir. 2010)(*citing South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)). Inventory searches conducted by police departments when they impound vehicles serve three purposes: (1) they protect the police from potential danger; (2) they protect the owner's property while it remains in police custody; ad (3) they protect the police against claims of lost, stolen, or damaged property. *Cartwright,* 630 F.3d at 613-14 (*citing Opperman,* 428 U.S. at 369). An inventory search is lawful if "the search is conducted as part of the routine procedure . . . and in accordance with established inventory procedures." *Cartwright,* 630 F.3d at 614 (*citing United States v. Jackson,* 189 F.3d 502, 508-09 (7th Cir. 1999)).

In the present case, the 2020 Ford 350 Crew Cab XLT pickup truck was seized pursuant to a seizure warrant issued by a Magistrate Judge of this Court. FBI policy requires that inventory searches be conducted of vehicles prior to their seizure. The agents followed this policy and conducted a search of the pickup prior to its seizure.

Even if this Court finds that Agents Cook and Roessler somehow acted improperly in searching the pickup at 210 Knollhaven Trail, there is simply no question that the documents found inside the truck would have been found at some point when an inventory of the vehicle was performed. "Under the inevitable discovery doctrine, if the government can establish that the evidence at issue, even though unlawfully obtained, would have inevitably been discovered

through lawful means, then the deterrence rationale animating the exclusionary rule has so little basis that the evidence should be admitted." *Cartwright,* 630 F.3d at 613 (*citing Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)).

In the present case, the agents had in hand a valid seizure warrant authorizing the seizure of the 2020 Ford 350 Crew Cab XLT pickup truck. Clearly, an inventory of the property inside that vehicle had to be performed at some point. Thus, even if the agents somehow acted improperly by searching the vehicle while they were at 210 Knollhaven Trail, the documents they found inside the vehicle unquestionably would have been discovered later. As a result, these documents are admissible under the inevitable discovery doctrine.

D.     Need for a Hearing

The United States respectfully submits that there is no need for a hearing on Defendant Tiner's motion to suppress. Tiner has not identified any disputed factual issues regarding the execution of the search warrant which would require suppression if resolved in Defendant's favor. As a result, this motion can be decided on the briefs of the parties.

### III. CONCLUSION

For the foregoing reasons, the United States respectfully requests that Defendant Tiner's motion to suppress be denied.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

s/ *Scott A. Verseman*
SCOTT VERSEMAN
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 20 CR 30166-SPM |
| EMMITT T. TINER, and | ) |
| Defendants. | ) |

**Certificate of Service**

I hereby certify that on October 4, 2021, I caused the foregoing "United States' Response to Defendant Tiner's Motion to Suppress" to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all attorneys of record.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

s/ *Scott A. Verseman*
SCOTT VERSEMAN
Assistant United States Attorneys
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700
Fax:  (618) 628-3720