UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>)<br>Plaintiff,                                )<br>)<br>v.                                            )<br>)<br>EMMITT T. TINER,                  )<br>)<br>Defendant.                           ) | 3:20-CR-30166-SPM |

**DEFENDANT'S MOTION TO DISMISS INDICTMENT OR, IN THE ALTERNATIVE, TO DISQUALIFY PROSECUTION TEAM FOR ACCESSING, POSSESSING, LISTENING TO AND DISSEMINATING CONFIDENTIAL ATTORNEY-CLIENT TELEPHONE CALLS**

Defendant Emmitt Tiner ("Tiner"), by and through undersigned counsel, respectfully moves this Court to dismiss the indictment because the Government obtained, possessed, listened to, and disseminated confidential telephone calls between Tiner and his counsel. In the alternative, Tiner requests that this Court disqualify the Government's Prosecution Team[1] including the Government's attorneys and agents who have had access to the recordings. Tiner also requests an evidentiary hearing.

*Introduction*

On November 18, 2020, Tiner was indicted in this case with 54 counts, including various counts of mail fraud, wire fraud, healthcare fraud, and money laundering.

On November 19, 2020, Tiner was arrested at his home in O'Fallon, Illinois and has been detained without bond in the St. Clair County Jail in Belleville, Illinois. Since the beginning of Tiner's incarceration, undersigned counsel has communicated with Tiner through various means

---

[1] At a minimum, this includes AUSA Scott Verseman, who has directly played a role in prosecuting this case, as well as the lead special agent, Adam Hoberg.

including in-person visits, Zoom meetings, the U.S. mail, and telephone calls initiated by Tiner from the St. Clair County Jail. Attorney-client communication by phone has been particularly important in light of the ongoing COVID-19 pandemic and the risks associated with in-person visitation – risks that have been heightened at various times since the beginning of the pandemic. Furthermore, area jails have at times prohibited in-person attorney-client visits due to the COVID-19 pandemic, further necessitating communication by telephone.

As the Court is aware, the discovery in this case is voluminous, consisting of over 51,000 pages of documents including video recordings, audio recordings, and photographs. The Government has provided discovery to defense counsel in stages, usually mailing to counsel a "wallet drive" containing thousands of pages of discovery. On April 21, 2021, counsel for the Government sent to defense counsel a wallet drive containing discovery along with a letter outlining the discovery. The letter contained the following language:

> Please note that the enclosed discovery includes certain phone calls made by your client from the St. Clair County Jail. As you know, the Government moved for pretrial detention of your client because we feared that he would threaten or physically harm victims and witness. For purposes of ensuring this was not happening, the investigating agents obtained some of the recorded phone calls made by your client from jail.
>
> In order to avoid exposure of the prosecution team to attorney/client and marital communications, a filter review process was established. Before the agents were allowed to listen to any of the calls, they were screened by Civil Division AUSA Laura Barke. Laura identified any calls that involved attorneys and Matissa Holt. Those calls were then segregated, and the agents were not permitted to listen to them.
>
> Based upon your prior request to receive unredacted recordings, we have included all of the jail phone calls that we obtained in this discovery package. In the process of reviewing these materials for production, I spot-checked some of the phone calls. When I recognized either your voice or that of Ms. Holt, I immediately stopped listening to those calls. Neither I nor the investigating agents have heard any discussions between you and your client where matters relating to the criminal case were discussed.

2

Over the last several months, counsel for Defendant has been reviewing the discovery in numerical order. During the week of October 11, 2021, counsel was able to listen to some of the recordings between counsel and Tiner which were of telephone calls initiated by Tiner from the St. Clair County Jail. Counsel is unsure of the total number of recorded telephone calls between Tiner and counsel that were obtained by the Government and provided to counsel. During that same week, counsel learned from discussions with AUSA Verseman that the recorded telephone calls were not only provided to him in discovery, but have all also been provided to attorney Greg Smith who represents Matissa Holt, a cooperating witness against Tiner. Mr. Verseman also confirmed that he "spot checked" some of the phone calls. The prosecution team in this case has not only had possession and access to privileged and confidential attorney-client phone calls, but by the Government's own admission, they have listened to some of the phone calls and provided them to a cooperating witness. In addition to any substantive discussions heard, at a minimum, the Government knows when and how often Tiner speaks with his attorney.

*Dismissal of the Indictment*

Where the Government intrudes into the attorney-client relationship, a federal court must "identify and the neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *United States v. Morrison*, 449 U.S. 361, 365 (1980); *see also Colon v. United States*, 191 F.2d 749, 757-58 (D.C. Cir. 1951) ("It is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him"). In Illinois and in this Court (which has adopted the Illinois Rules of Professional Responsibility as the local rules of this Court), Rule 4.4(a), *inter alia*, prohibits a lawyer, in representing a client, from using "methods of obtaining evidence that violate the legal rights" of a third person. This rule reflects that lawyers should not make "unwarranted

intrusions into privileged relationships, such as the client-lawyer relationship." IL. R. S. Ct. R.P.C. Rule 4.4 cmt [1].

In a recent case, it was discovered that the U.S. Attorney's Office in the District of Kansas had obtained <u>soundless</u> recordings of privileged and confidential communications between attorneys and clients. *See United States v. Carter*, Case No. 16-20032-02-JAR (D. KS.) (Aug. 13, 2019) (Doc. 758). Despite the Government's protestations that it meant no harm, Judge Robinson held several weeks of evidentiary hearings, appointed a Special Master, ordered the Government to preserve evidence and cooperate, required the Government to be represented in this inquiry by a disinterested federal prosecutor from another U.S. Attorney's Office, and ultimately held the U.S. Attorney's Office in contempt of court for its conduct.[2] In a 188-page order, Judge Robinson explained:

> This Court has previously concluded, however, that both verbal and non-verbal communication falls within the ambit of privileged, confidential attorney-client communications…. Other detainees whose meetings were recorded may have been preparing for release hearings, evaluating evidence, negotiating a plea, or deciding whether to go to trial. The value of knowing a defendant is angry, reviewing documents, speaking to counsel without an interpreter, or even refusing to talk or review documents may not have apparent value to an outside observer, but as demonstrated in these proceedings, can grant a tactical advantage to a prosecutor. The Court adopts its previous findings that soundless video can constitute privileged attorney-client communication.

*Carter*, Doc. 758 at 164-65. Judge Robinson then explained:

> an affidavit from defense counsel in each individual case is necessary to confirm that the nature and purpose of the meeting(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery. This threshold showing does not require the petitioner to reveal the substance of the conversation. Review of the videos and/or the submission of this affidavit will not constitute a waiver of any individual defendant's privilege under Fed. R. Evid. 502.

---

[2] The U.S. Attorney's Office was held in contempt of court for, *inter alia*, failing to preserve evidence despite being made aware of the dispute over soundless video recordings of attorney-client meetings. Thus, Tiner has also sent Government counsel and both special agent members of the Prosecution Team a litigation hold letter in an effort to avoid a recurrence of what happened in Kansas.

*Id*. at 165. In other words, Judge Robinson correctly concluded that even soundless video recordings of attorneys meeting with their clients are unambiguously privileged provided defense counsel confirmed the nature and purpose of the meeting was within the ambit of protected communications. To be clear, undersigned counsel is unambiguously and without hesitation representing to this Court that the <u>audio</u> recordings obtained by, and in the possession of, the Government reflects trial preparation communications between Tiner and his counsel. So that there is no doubt, undersigned counsel was appointed to represent Tiner in this case and undersigned counsel has never had any other relationship with Tiner. As such, undersigned counsel has never had a conversation with Tiner that was not privileged and confidential.

To be clear, Tiner did not waive privilege and neither Tiner nor undersigned counsel waived the work-product privilege. The attorney-client privilege belongs to the client—and it is the client alone who may waive it. *See Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010); *see also United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir. 1990) ("It is a 'bedrock principle that the attorney-client privilege is the client's and his alone'"). Unlike the attorney-client privilege which belongs solely to the client, both client and attorney hold the work-product privilege. *Sandra T.E.*, 600 F.3d at 618. While a client can waive privilege—either expressly or by implication—any waiver must be intentional. *See* Fed. R. Evid. 502(a); *see also Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985).

Where, as here, the Prosecution Team has infringed on the attorney-client relationship and has had access to information that could provide them a tactical advantage, dismissal is the appropriate remedy. *See United States v. DiDomenico*, 78 F.3d 294, 299 (7th Cir. 1996) ("denial of the right to counsel . . . or of any other fundamental rights of criminal defendants . . . is reversible error even if not shown to be prejudicial—even if shown to be completely harmless"); *United*

*States v. Levy*, 577 F.2d 200, 208 (3d Cir. 1978) (dismissing indictment where government learned defense strategies: "The Government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself"); *United States v. Orman*, 417 F. Supp. 1126, 1131-32 (D. Colo. 1976) (court dismissed indictment because the Government eavesdropped on attorney-client conferences and thereby unlawfully obtained privileged information).

Obtaining, possessing, listening to, and disseminating to third parties privileged and confidential attorney-client telephone calls is nothing short of "shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." *United States v. Russell*, 411 U.S. 423, 432 (1973). Indeed, even in situations unlike this where the defendant suffered no prejudice, federal courts have long recognized a federal district court's inherent supervisory power to remedy wrongs. As the First Circuit explained:

> the use of supervisory power to dismiss an indictment, in the absence of injury to the defendant, may not be entirely a dead letter. The [Supreme] Court's reasoning in *United States v. Hasting*, 461 U.S. 499 (1983) may be read to leave open the possibility that the goal of deterring future misconduct would justify the use of supervisory power to redress conduct not injuring defendants if the conduct is plainly improper, indisputedly outrageous, and not redressable through the utilization of less drastic disciplinary tools.

*United States v. Flores-Rivera*, 56 F.3d 319, 328, n. 7 (1st Cir. 1995); *see also DiDomenico*, 78 F.3d at 299. If this Court has the supervisory power to dismiss an indictment "in the absence of injury to the defendant," dismissal is even more warranted where, as here, the defendant has suffered serious injury in that the Government obtained, listened to, and disseminated recordings of privileged and confidential telephone calls between Tiner and legal counsel. This kind of conduct should never happen in a federal criminal case—but it did here and it cries for a remedy.

6

Furthermore, this Court is faced with this decision against the backdrop of federal prosecutors increasingly pushing the boundaries into the attorney-client relationship—as evidenced by the outrageous conduct of the U.S. Attorney's Office in Kansas whose primary violation was obtaining soundless video recordings of attorneys meeting with their clients. In an article published in Winter 2017, two legal ethics professors explained: "Recently, government officials have been intruding into attorney-client relationships in unexpected ways." Peter Joy and Kevin McMunigal, "When Does Monitoring Defendants and Their Lawyers Cross the Line?" *Criminal Justice*, Vol. 31, No. 4 (ABA – Winter 2017), at p. 46.

Indeed, federal courts considering this issue have considered the extent to which the prosecution intruded into the attorney-client relationship. For instance, the Tenth Circuit explained:

> Because we believe that a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a *per se* violation of the Sixth Amendment. In other words, we hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, *a prejudicial effect on the reliability of the trial process must be presumed*. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct. We also note that "[p]rejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost."

*Schillinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995) (emphasis added).

As the Second Circuit explained in a case involving misconduct at the stage of the proceedings that led to the indictment, "dismissal of an indictment is justified to achieve either of two objectives: to eliminate prejudice to a defendant; or, pursuant to our supervisory power, to prevent prosecutorial impairment of the grand jury's independent role." *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir. 1983) (dismissing indictment). In this case, dismissal is warranted both

to eliminate prejudice to Tiner and to remedy the Government's improper intrusion into privileged and confidential communications—and attorney work-product—now available to the Prosecution Team to use against Tiner at trial.

<u>*In the Alternative, Disqualification of the Tainted Prosecution Team is Necessary*</u>

Where, as here, prosecutors have come into possession of privileged information, disqualification is an appropriate and fairly common remedy. As Professors Joy and McMunigal explained, once a prosecutor has knowledge of privileged communications, "disqualification may be a suitable remedy to ensure that the confidential information will not be used against the defendant in either pretrial negotiations or at trial." Peter Joy and Kevin McMunigal, *supra*, at p. 60.

In *United States v. Horn*, a federal district court was faced with a situation where a federal prosecutor obtained knowledge as to which documents the defense team had requested copies. 811 F. Supp. 739 (D.N.H. 1992), *rev'd in part on other grounds*, 29 F.3d 754 (1st Cir. 1994). The court correctly reasoned that this information provided the prosecution team with the mental impressions of the defendant's attorney and, accordingly, the court disqualified the tainted prosecutor from further participation in the case. *Horn*, 811 F. Supp. at 752 ("The lead prosecutor is ordered not to discuss the documents with any prosecutor or witness in this case and not to participate further in any way, directly or indirectly, in the trial preparation or trial of this case").

Indeed, the Government itself has instituted so-called taint team processes in an effort to avoid the necessity of having its prosecutors and case agents disqualified from cases where it has come into contact with privileged information. For instance, the United States Attorneys Manual expressly recommends that "a 'privilege team' should be designated, consisting of agents and lawyers not involved in the underlying investigation," precisely "to ensure that the investigation

is not compromised by exposure to privileged material relating to the investigation or to defense strategy." *See* United States Attorneys Manual, Department of Justice, Section 9-13.000(E). And the Government has, in certain cases, expressly requested approval by the courts as to its filter process so as to avoid the inevitable consequence of disqualification. *See, e.g., In re Investigation of Bay Ingram*, 915 F. Supp. 2d 761, 763 (E.D. La. 2012) (granting Government's motion to order the use of an independent taint team "'to avoid any disqualification of the agents and prosecutors pursuing the criminal investigation…'") (quoting Government's motion). In other words, the Government itself has acknowledged the remedy of disqualification where prosecutors and/or case agents come into contact with privileged communications—and federal courts have treated taint very seriously. *See United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1040 (D. Nev. 2006) (By "choosing to take matters into its own hands, the prosecutors should now have the burden of proving that they did not learn and use any privileged material") (internal quotations omitted); *United States v. Neill*, 952 F. Supp. 834, 841 (D.D.C. 1997) (placing burden on prosecutors "to rebut the presumption that tainted material was provided to the prosecution team"); *see also Richards v. Jain*, 168 F. Supp. 2d 1195, 1200 (W.D. Wash. 2001) (disqualifying attorney in civil context, because "it is apparent that eleven months of access to privileged materials creates an appearance of impropriety and so taints the proceedings that the harsh remedy of disqualification is justified").

In this case, it is beyond meaningful dispute that the entire Prosecution Team had access to privileged and confidential communications and to attorney work product (*e.g.* recorded telephone calls between Tiner and defense counsel). If dismissal is denied, there is no remedy short of disqualification that would ensure that Tiner is not further prejudiced because the Prosecution

9

Team has already been tainted in this case.[3] But what happened here is even more troubling: the prosecution provided recorded attorney-client phone calls between Tiner and his counsel *to a cooperating witness*. Neither the Government nor this Court can meaningfully investigate the scope of that problem without violating that witness's attorney-client privilege and/or that witness's attorney's work product privilege.

In a recent case in the Southern District of Florida, the prosecution team (like the prosecutor in *Horn*) had obtained opinion work product insofar as it received copies of every document the defense team had requested copied from a contracted copier service. *See United States v. Schapiro, et. al.* (Case No. 1:14-CR-20715-MGC) (Doc. 184) (S.D. Fl. 2016). The defense moved for dismissal and disqualification. (*Id.* Doc. 174). After a multi-day hearing on this issue and before the district court issued a ruling, the case was resolved by very defendant-friendly plea dispositions. However, the Government's responsive pleading to the allegations in that case is instructive. The Government expressly and correctly acknowledged that "opinion work product" is "more strongly protected" than fact work product; that protection of opinion work product is necessary when "disclosure creates a real, non-speculative danger of revealing the lawyer's thoughts"; and that dismissal of an indictment is unwarranted absent a showing of prejudice. (*Id.* Doc. 184). While those positions may have been self-serving to the Government in that case, they bolster Tiner's position in this case: there is no question that the Prosecution Team intentionally collected all of Tiner's calls with his attorney, making them part of the Government's case file.

It is unsurprising that courts faced with similar situations have taken these matters very

---

[3] Tiner acknowledges that the Prosecution Team employed a taint review process after obtaining these phones calls. However, the Prosecution Team also, admittedly, disregarded any work done by that team by failing to segregate attorney-client calls, "spot-checking" all calls and hearing portions of attorney-client calls, retaining access to those calls so that even inadvertent review would still be possible, and disseminating those calls to a potential Government witness. Had the Government actually employed an effective taint team, this would have never happened.

seriously. For example, in *Horn*, *Schapiro*, and most recently *Carter* in Kansas, lengthy evidentiary hearings have led federal courts appropriately to provide remedies for violations of the attorney-client relationship. What the Government did in this case is inexcusable and unprecedented but for cases like *Carter* where the U.S. Attorney's Office was held in contempt of court.

What stands out about this case is that the Government purports to have employed a taint team. But if that actually occurred, there is no reason these calls would not have been identified and segregated. Without exception, each call was made by Tiner to the same phone number: defense counsel's law firm's landline. Any taint review would have easily identified this number even without hearing any conversation and would have easily identified undersigned counsel's voice. If that was not the purpose of the taint review, it is difficult to understand what was. What really happened is that the Government did not utilize an effective taint review—and because of that, the Government unambiguously violated Tiner's constitutional right to private consultation with his legal counsel.

*Conclusion*

Based on the foregoing, Tiner requests that this Court dismiss this case or, in the alternative, disqualify the tainted Prosecution Team. Tiner also requests an evidentiary hearing.

Respectfully submitted,

**Margulis Gelfand, LLC**

<u>/s/ *William S. Margulis*</u>
William S. Margulis
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
bill@margulisgelfand.com
*Counsel for Defendant*

## Certificate of Service

I hereby certify that the foregoing was filed electronically with the Clerk of the Court to be served electronically upon the United States of America and Assistant United States Attorney Scott Verseman.

/s/ *William S. Margulis*
William S. Margulis
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
bill@margulisgelfand.com
*Counsel for Defendant*