IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20 CR 30166-SPM-01 |
| | ) | |
| EMMITT T. TINER, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT TINER'S
MOTION TO DISMISS THE INDICTMENT OR, IN THE
ALTERNATIVE, TO DISQUALIFY THE PROSECUTION TEAM**

The United States of America, by and through its attorneys, Steven D. Weinhoeft, United

States Attorney for the Southern District of Illinois, and Scott A. Verseman, Assistant United

States Attorney for said district, respectfully submits the following response to Defendant Tiner's

Motion to Dismiss the Indictment, or in the Alternative, to Disqualify the Prosecution Team:

## I.  INTRODUCTION

Defendant Tiner has moved to dismiss the indictment for "accessing, possessing, listening

to, and disseminating confidential attorney-client telephone calls."  R. 98 at p. 1.[1]  Tiner also asks,

in the alternative, that the prosecution team be disqualified.  *Id.*

Tiner's motion to dismiss should be denied because he is asserting a privilege over

unprivileged calls.  His motion takes this threshold issue for granted, assuming that any phone

calls between a defendant and his counsel must be privileged without considering the context of

the calls.  During the calls in question, Tiner spoke to his attorney on jail lines that they both knew

---

[1]         All citations to documents contained in the official court record of this case are denoted "R." and followed
by the applicable document number, and, if relevant, page number.

were subject to recording and monitoring.  Tiner or his counsel could have taken steps to prevent this recording and monitoring from happening – to ensure their calls were truly private and privileged – but they didn't.  Instead, they allowed the presence of a third party to prevent any privilege from attaching in the first place.  If the Court agrees with the multiple circuit and district courts that have faced this same issue, Tiner's motion to dismiss fails as a matter of law.

Tiner's motion should also be denied because no one on the prosecution team has heard the substance of any phone call between Tiner and his counsel.  Even though his recorded jail calls with counsel were not privileged, the Government never wanted to listen to those phone calls and consistently avoided listening to them.  The only reason the Government obtained the jail calls in the first place was to ensure that Tiner was not threatening witnesses.  This safety concern was shared both by the Magistrate Judge and this Court at Tiner's detention hearings.  For that reason, and that reason alone, the Government requested Tiner's recorded calls from St. Clair County Jail.

When the Government learned that the jail calls might include conversations between Tiner and his attorney, the Government set up a filter team with a detailed protocol to prevent those calls from being reviewed by federal agents.  And, when in the course of producing the calls in discovery a few calls were inadvertently clicked on before production, the Government immediately stopped the recordings before any substance was discussed, made a contemporaneous note in the file, and self-reported the incident to counsel over eight months ago.  Tiner was in no way prejudiced by anything that occurred relating to his jail calls.  The motion to dismiss lacks merit and should be denied without an evidentiary hearing.

## II.  FACTUAL BACKGROUND

Tiner was arrested on November 19, 2020, pursuant to an arrest warrant.  R. 8.  At his initial appearance, the United States moved for pretrial detention.  R. 7, 10.  A detention hearing

was conducted on November 25, 2020.  R. 19.  On December 15, 2020, Magistrate Judge Sison entered an order directing that Tiner be detained pending trial.  R. 33.  Judge Sison concluded: "Defendant poses a serious risk of danger to potential witnesses as well as a serious risk of obstruction. . . ."  R. 33 at p. 11.  Judge Sison based this conclusion upon the threats of violence Defendant made to the victims while committing the offenses alleged in the indictment, as well as evidence that Tiner had threatened witnesses in connection with other cases.  R. 33 at pp. 6, 8.  *See also* Exhibit 1 (Screenshot of text sent by Tiner to victim K.G.).

Tiner moved to revoke Judge Sison's detention order.  R. 45.  This Court conducted a hearing on Tiner's motion on January 29, 2021.  R. 49.  On February 2, 2021, this Court entered an order denying Tiner's motion to revoke the order of detention.  R. 51.  Among the reasons given for its decision, this Court stated:  "Tiner represents a serious threat to obstruct justice or harm witnesses."  R. 49 at p. 3.

Since his arrest, Tiner has been held at the St. Clair County Jail.  Pursuant to a contract with the United States Marshals Service, the St. Clair County Jail houses federal prisoners awaiting trial in federal court in East St. Louis, Illinois.  Exhibit 2 (Affidavit of Scott Sheldon) ¶ 2.

The Saint Clair County Jail provides a system for inmates to conduct private telephone conversations with their attorneys.[2]  Ex. 2, ¶ 4.  When an attorney calls the jail and requests to speak with his or her client, the jail schedules a time for the attorney to have a private call.  Ex. 2 at ¶ 5.  The jail gives the attorney a number to call, which rings to a cordless phone that is designated for attorney calls.  Ex. 2 at ¶¶ 5-6.  When the attorney calls that number, the jail gives that phone to the inmate and places the inmate in a private room.  Ex. 2 at ¶ 5.  The calls conducted on the attorney phone are not monitored or recorded.  Ex. 2 at ¶ 4.  Defense counsel in the present

---

[2]      This system was in place prior to Tiner's arrest on November 19, 2020.

case, William Margulis, has utilized this system to conduct private telephone conversations with Tiner at the St. Clair County Jail.  Ex. 3 at ¶ 7.  None of the calls made on this telephone were recorded and are not at issue in the present motion.

The St. Clair County Jail also provides telephones for inmates to make outgoing calls. Exhibit 3 (Affidavit of Rodney Wilson), ¶ 2. These telephones are located in public areas in the cellblocks and can be overheard by other inmates. Ex. 3 at ¶ 2.  The calls made on these telephones are recorded.  Ex. 3, ¶ 4.  Inmates are advised that their calls are subject to recording when they are booked into the jail.  Ex. 3, ¶¶ 5-6.  Specifically, they are given a pamphlet which advises them that their telephone calls will be subject to recording and monitoring.  Ex. 2, ¶ 6.

The St. Clair County Jail utilizes the Securus system for recording inmate calls.  Ex. 3, ¶ 3.  During the time period applicable to this motion, the Securus system interjected a preamble onto each call placed by the inmates.  Ex. 3, ¶ 7.  When the recipient of the inmate's call picked up the phone, a voice on the Securus system stated:  "This is a collect call from . . . ."  Ex. 3, ¶ 7. The inmate was then required to state his name.  Ex. 3, ¶ 7.  Immediately after that, the Securus voice stated:  "This call is subject to monitoring and recording."  Ex. 3, ¶ 7.  After this preamble, the system permitted the inmate to converse with the call recipient on the recorded line.  Ex. 3, ¶ 7.

In addition to the private attorney phone, the St. Clair County Jail provides various other ways for inmates to engage in confidential discussions with their attorneys.  Ex. 2, ¶ 3.  When attorneys come to the jail for visits, they are placed in private rooms with their clients.  Ex. 2, ¶ 8. The conversations between the attorneys and the inmates in these rooms are not recorded or monitored.  Ex. 2, ¶ 8.

Recognizing the concerns about in-person meetings created by the COVID-19 pandemic, the St. Clair County Jail provides virtual options for inmates to meet confidentially with their

lawyers.  Ex. 2, ¶¶ 10, 12.  Specifically, federal inmates are permitted to use an iPad supplied by the U.S. Probation Department to conduct private meetings with their attorneys via Zoom.  Ex. 2, ¶ 10.  As with in-person meetings, these Zoom meetings conducted via the federal iPad are not recorded or monitored.  Ex. 2, ¶ 10.  Confidential Zoom videoconferences can also be conducted through the Securus system.  Ex. 2, ¶ 10.

The St. Clair County Jail also permits attorneys to conduct unrecorded calls with their clients via the telephones located in the cellblocks.  Ex. 3, ¶ 10.  If the attorneys wish to do this, all they need to do is contact the jail and provide the phone number they want their clients to call.  Ex. 3, ¶ 11.  The jail will then input that number into the Securus system and calls to that number will not be monitored or recorded.  Ex. 3, ¶ 11.  Inmates are also permitted to request that calls made to their attorney's number not be recorded.  Ex. 3, ¶ 10.  To prevent abuse, however, the inmates are directed to submit their requests in writing.  Ex. 3, ¶ 10.  The jail then attempts to verify that the numbers provided by the inmates do, in fact, belong to attorneys.  Ex. 3, ¶ 10.

In December of 2020, Internal Revenue Service – Criminal Investigations ("IRS-CI") Special Agent Brad Roessler told the undersigned Assistant United States Attorney ("AUSA") that he wished to review the calls that Tiner had placed from the jail.  Exhibit 4 (Affidavit of Brad Roessler) ¶ 2; Exhibit 5 (Affidavit of Scott Verseman) ¶ 2.  Because of Tiner's prior threats, Agent Roessler wanted to ensure that Tiner was not threatening witnesses from the jail.  Ex. 4, ¶ 2; Ex. 5, ¶ 2.  The undersigned AUSA agreed with Agent Roessler's request, but stated that the calls obtained from the jail should not include any calls between Tiner and his attorney.  Ex. 5, ¶ 2.

After he conferred with the jail, Agent Roessler informed the undersigned AUSA that the jail does not conduct a filter review of requested jail calls and cannot practically determine whether any attorney-inmate calls will be included within a production.  Ex. 4, ¶ 4; Ex. 5, ¶ 3,  If an attorney

or inmate requests that their calls from the cellblock phones be treated as private, those calls are not recorded and will not be produced. Ex. 3, ¶¶ 10-11. However, some attorneys have not requested that their numbers be marked as private. Ex. 3, ¶ 8. If the inmate or these attorneys do not request private calls, conversations such as these would also be recorded and included within the jail's production.[3] Ex. 3, ¶¶ 17-20.

The only way for the jail to guarantee that there are absolutely no calls with attorneys contained in a production is for a jail employee to listen carefully to each call, attempt to determine whether the person called is an attorney, and then exclude that call from the materials provided. Ex. 3, ¶¶ 16-17. Because of the volume of inmate calls and the number of requests that the jail receives for inmate calls, however, the jail does not have the resources to perform such reviews. Ex. 3, ¶ 20. For example, the St. Clair County Jail downloaded and distributed over 80,000 jail calls in response to requests just last year. Ex. 3, ¶ 19. The jail simply does not have the staff or the resources to review 80,000 jail calls.

After learning that the jail calls could potentially include attorney-inmate conversations, the undersigned told Agent Roessler that the calls he obtained from the jail would have to be screened by a filter agent before Roessler could listen to them. Ex. 4, ¶ 4; Ex. 5, ¶ 4. The undersigned asked AUSA Laura Barke to serve as the filter agent. Ex. 4, ¶ 5; Exhibit 6 (Affidavit of Laura Barke) ¶ 2. AUSA Barke serves in the Civil Division of the U.S. Attorney's Office for the Southern District of Illinois. Ex. 5, ¶ 6; Ex. 6, ¶ 1. AUSA Barke is not involved in the prosecution of Tiner, and is not supervised by the undersigned.[4] Ex. 5, ¶ 6; Ex. 6, ¶ 2.

---

[3]     Tiner just recently submitted a request to the St. Clair County Jail that his calls to his attorneys made from the cellblock phones not be recorded. Ex. 3, ¶ 14. Mr. Margulis has never requested that the St. Clair County Jail mark calls to his phone from the cellblock phones as private. Ex. 3, ¶ 13.

[4]     AUSA Barke had previously served as a filter agent for another matter in this case. Ex. 5, ¶ 7; Ex. 6, ¶ 3. Prior to indictment, victim R.G. made two undercover, consensually recorded, telephone calls with Tiner. Ex. 5, ¶ 7;

The undersigned AUSA created a filter protocol for AUSA Barke to follow.  Ex. 5, ¶ 6; Ex. 6, Ex. A.[5]  In summary, the undersigned asked AUSA Barke to:  (1) review the recorded jailhouse calls; (2) determine which calls involved an attorney or Tiner's spouse, Matissia Holt; (3) stop listening to any calls if she determined that an attorney or Ms. Holt was a participant; (4) create a log indicating which calls involved an attorney or Ms. Holt; and (5) provide the log to Agent Roessler.  Ex. 6, Ex. A.  The undersigned copied Agent Roessler on this email to ensure that he received the same instructions.  Ex. 5, ¶ 8; Ex. 6, Ex. A.

After receiving instructions from the St. Clair County Jail, Agent Roessler used the passcode provided by the jail, accessed the Securus system, and downloaded Tiner's recorded jail calls to a standalone computer.  Ex. 4, ¶ 5.  Agent Roessler then copied the calls to two DVDs and hand-delivered one of those DVDs to AUSA Barke at the U.S. Attorney's Office.  Ex. 4, ¶ 5; Ex. 6, ¶ 6.  Other than possibly performing a quick check to insure that the calls downloaded properly, Agent Roessler did not listen to any of the calls prior to delivering the DVD to Ms. Barke. Ex. 4, ¶ 5.

AUSA Barke then conducted her filter review of one hundred and one (101) outgoing calls made by Tiner between November 19, 2020 and December 15, 2020.  Ex. 6, ¶¶ 6-7.  As she conducted her review, she created a log.  Ex. 6, ¶ 7; Ex. 6, Ex. B.  Because she stopped listening

---

Ex. 6, ¶ 3.  During these calls, Tiner made certain unsolicited comments about speaking with Federal Defender Preston Humphrey.  Ex. 5, ¶ 7; Ex. 6, ¶ 3.  When the United States Attorney's Office discovered that Tiner had, in fact, spoken with Mr. Humphrey, AUSA Barke was asked to review subsequent voicemails Tiner left for R.G. and items that Tiner provided to R.G. and redact all references to Mr. Humphrey.  Ex. 5, ¶ 7; Ex. 6, ¶ 3.  AUSA Barke performed this task. Ex. 5, ¶ 7; Ex. 6, ¶ 3.

The United States does not believe that Tiner's comments about Mr. Humphrey are, in fact, covered by the attorney-client privilege.  Tiner voluntarily revealed this information to R.G. without any solicitation.  Thus, to the extent that the information was privileged, Tiner waived the privilege.  The United States simply asked AUSA Barke to perform this review and redaction process to take the most conservative approach possible.

[5]     Documents attached to the affidavits are denoted "Ex." and followed by a sequential letter.

to each call once she determined Tiner's attorney or office staff was on the line, AUSA Barke did not hear the substance of any conversation between Tiner and his attorney.  Ex. 6, ¶ 8.  She noted these calls on the log, as well as calls involving Ms. Holt.  Ex. 6, ¶ 8.  Only 12 of the 101 calls involved Mr. Margulis or his staff.  Ex. 6., Ex. B.

During her review, AUSA Barke posed two questions to the undersigned.  Ex. 5, ¶ 9; Ex. 6, ¶ 9; Ex. 6, Ex. C.  First, AUSA Barke asked whether she should listen to Tiner's calls with Holt to determine if Tiner had given her instructions to threaten or harm witnesses.  *Id.*  The undersigned instructed AUSA Barke not to listen to those calls.  *Id.*  Secondly, AUSA Barke asked if she should listen to Tiner's calls with third parties to determine whether Tiner discussed communications with his attorneys in those calls.  *Id.*  If so, those calls could then be placed on the list of calls that Agent Roessler was not permitted to review.  *Id.*  The undersigned AUSA agreed with that procedure, and asked Agent Barke to note on her log any calls where Tiner discussed conversations with his attorney.  *Id.*  These calls were then identified on the log as calls that Agent Roessler could not listen to.  Ex. 6, ¶ 9.

After AUSA Barke completed her review, she provided her log to Agent Roessler.  Ex. 6, ¶ 10; Ex. 4, ¶ 8.  Using the log as a guide, Agent Roessler reviewed the calls.[6]  Ex. 4, ¶ 8.  He did not listen to any calls that the log indicated:  (1) involved attorneys; (2) involved Ms. Holt; or (3) contained conversations where Tiner disclosed to third parties his discussions with his attorney.  Ex. 4, ¶ 9.

Federal Rule of Criminal Procedure 16(B)(i) requires the Government to disclose to the defense "any relevant written or recorded statement by the defendant if:

---

[6]      Agent Roessler did not discover any attempts by Tiner to threaten or harass witnesses in this case. Ex. 4, ¶ 9.

- The statement is within the government's possession, custody, or control; and

- The attorney for the government knows – or through due diligence could know – that the statement exists;"

The undersigned AUSA interpreted this rule to require disclosure to the defense of the jail recordings that had been downloaded by Agent Roessler, including the calls by Tiner to his attorney and his wife.  Ex. 5, ¶ 10.

At the U.S. Attorney's Office's request, Agent Roessler copied all of the jail calls along with other case material to a "wallet" drive for processing and production in discovery.  Ex. 4, ¶ 10.  Paralegal Specialist Sandra Keller[7] of the U.S. Attorney's Office received that wallet drive.  Exhibit 7 (Affidavit of Sandra Keller), ¶¶ 1-2.  Ms. Keller was assigned to assist with the assembly, processing, and production of discovery in this case.  Ex. 7, ¶ 2.

Because of the volume of material to be disclosed, the undersigned AUSA determined that the discovery should be input into a discovery review program known as Eclipse.  Ex. 5, ¶ 11.  Eclipse provides a variety of tools to facilitate review, including permitting word searches of voluminous databases.  Ex. 7, ¶ 6.  Eclipse also permits reviewers to place electronic tags on documents, known as "Sticky Flags."  Ex. 7, ¶ 6.  These Sticky Flags can then be searched to permit the reviewer to quickly locate relevant items.  Ex. 7, ¶ 6.  Although the Eclipse program was previously available at the U.S. Attorney's Office, the undersigned had not previously used Eclipse for discovery production and document review.  Ex. 5, ¶ 11.

Due to the massive volume of discovery to be uploaded into the Eclipse program, Ms. Keller requested assistance from the Department of Justice's Litigation Technology Service Center ("LTSC").  Ex. 7, ¶ 3.  On February 3, 2021, Ms. Keller uploaded a digital copy of the discovery

---

[7]       Ms. Keller was formerly known as Sandra Rodriguez.

materials, including the jail calls, to the LTSC.  Ex. 7, ¶ 4.  Because the LTSC works on multiple discovery projects for U.S. Attorney's Offices throughout the country, over one month elapsed before the LTSC could fully process the discovery in this case.  Ex. 7, ¶ 4.  March 8, 2021, Ms. Keller received the processed materials back from the LTSC.  Ex. 7, ¶ 5.  Ms. Keller then notified the undersigned AUSA that the discovery was ready to be reviewed before production to the defense.  Ex. 7, ¶¶ 6-7.  Ms. Keller never listened to the jail calls, either before or after they were sent to the LTSC.  Ex. 7, ¶ 8.

In order to facilitate his client's review of discovery Mr. Margulis requested that the undersigned AUSA provide a "jail" copy of discovery materials that could be left at the St. Clair County Jail and reviewed by Tiner when defense counsel was not present.  Ex. 5, ¶ 12.  The undersigned agreed to Mr. Margulis' request.  Ex. 5, ¶ 12.  The Memorandum Order governing discovery entered by this Court, however, prohibits discovery materials containing Personally Identifying Information ("PII"), reports of witness interviews, and grand jury testimony from being provided to the defendants.  R. 42.  In order to ensure compliance with this order, the undersigned AUSA reviewed all materials in the Eclipse program before they were produced to the defense.  Ex. 5, ¶ 13.  During his review of the discovery materials, the undersigned also placed Sticky Flags on certain items so that they could be located quickly and evaluated as possible trial evidence.  Ex. 5, ¶ 14.

As he was reviewing the discovery materials to be produced, the undersigned AUSA came to the section of materials which contained Tiner's jail calls.  Ex. 5, ¶ 15.  The Eclipse program does not list the telephone numbers and names of the parties called.  Ex. 5, ¶ 15; Ex. 5, Ex. A. Instead, the program simply contains a paperclip icon, which indicates that the item is a recording. Ex. 5, ¶ 15; Ex. 5, Ex. A.

The undersigned clicked on some of the jail calls. Ex. 5, ¶ 16. Three of the calls the undersigned clicked on were calls involving Tiner and Mr. Margulis. Ex. 5, ¶ 16. As soon as the undersigned heard Mr. Margulis' voice, he immediately closed the files.[8] Ex. 5, ¶ 17. The undersigned did not hear any substantive conversations between Mr. Margulis and Tiner, including legal advice or any discussions of trial strategy. Ex. 5, ¶ 18. Immediately after he closed the files, the undersigned placed Sticky Flag notes on each digital file indicating the recording contained a call involving Mr. Margulis, and that he immediately closed the files when he heard Mr. Margulis' voice. Ex. 5, ¶ 19; Ex. 5, Exs. B, C, and D.

On April 21, 2021, the United States sent to defense counsel the batch of discovery that contained the jail calls. Ex. 5, ¶ 20. In the cover letter that accompanied this distribution, the undersigned alerted defense counsel that the discovery materials included some of the calls Tiner made from the jail, including some calls made to Mr. Margulis. Ex. 5, Ex. E. The undersigned also disclosed that he opened some of the calls, but immediately closed the files when he heard Mr. Margulis' voice. Ex. 5, Ex. E.

The jail calls were also included in the discovery that was sent to Greg Smith, counsel for co-defendant Matissia Holt. Ex. 5, ¶ 21. As with Mr. Margulis, the cover letter that was sent to Mr. Smith alerted him to the fact that Tiner's jail calls, including calls with Mr. Margulis, were contained in the materials. Ex. 5, Ex. F. Neither Mr. Smith nor the co-defendant have listened to any of the calls between Tiner and Mr. Margulis. Exhibit 8 (Affidavit of Greg Smith); Exhibit 9 (Affidavit of Matissia Holt).

---

[8]     The undersigned also immediately exited other calls when he determined that the other participant was Tiner's wife.

Approximately 6 months passed after the discovery containing the jail calls was tendered. Ex. 5, ¶ 22.  In October 2021, Mr. Margulis contacted the undersigned AUSA and indicated he was upset that telephone calls between him and Tiner were included in the discovery materials.  R. 98 at p. 3; Ex. 5, ¶ 22.

### III. ARGUMENT

A.    <u>Recorded Jail Calls are not Protected by the Attorney-Client Privilege</u>

Recorded jail calls, where the defendant knows he is being recorded, are not protected by the attorney-client privilege.  Defendant Tiner's motion to dismiss should be denied on this basis alone.

The threshold question this Court must answer in ruling on Tiner's motion to dismiss is whether the recorded jail calls between Tiner and Mr. Margulis are even covered by the attorney-client privilege.  If the Court determines that the calls are not privileged, Tiner's motion should be denied without further inquiry.

The attorney-client privilege must be narrowly construed, "because it is in derogation of the search for the truth."  *United States v. White,* 950 F.2d 426, 430 (7th Cir. 1991)(*quoting In re Walsh,* 623 F.2d 489, 493 (7th Cir. 1980)).  The Seventh Circuit has held that the communications between lawyers and their clients are covered by the attorney-client privilege when the following elements are established:

> (1) Where legal advice is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except that the privilege be waived.

*United States v. Evans,* 113 F.3d 1457, 1461 (7th Cir. 1997)(*quoting* 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 (John T. McNaughton rev.1961)).  "The party seeking

to invoke the privilege bears the burden of proving all of its essential elements." *Evans*, 113 F.3d at 1461 (*citing White*, 950 F.2d at 430).

The Seventh Circuit has held that the marital communications privilege does not attach where the communication took place during a recorded call from prison. *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998). During the trial underlying *Madoch*, the Government introduced into evidence a recording of a jail call between the defendant and her husband while her husband was incarcerated at the Metropolitan Correctional Center ("MCC"). On appeal, the defendant argued that her conviction was improperly based upon evidence that was protected by the marital communication privilege. *Id.* Rejecting this claim, the Seventh Circuit first noted "'communications made from jail are likely to be overheard by others, and, thus, it is unreasonable to intend such a communication to be confidential.'" *Id.* (*quoting Wolfe v. United States*, 291 U.S. 7, 12-13 (1934)). The court then held: "Thus, because the marital communications privilege protects only communications made in confidence, *see id.*, under the unusual circumstances where the spouse seeking to invoke the communications privilege knows that the other spouse is incarcerated, and bearing in mind the well-known need for correctional institutions to monitor inmate conversations, we agree with the district court that any privilege Janice and Larry might ordinarily have enjoyed did not apply." *Id.* In arriving at this conclusion, the *Madoch* court cited *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989) for the proposition that a "non-prisoner caller had no reasonable expectation of privacy when speaking on prison phone in part because [the prison] placed her on constructive notice that prison officials could legally monitor calls."

The Eighth and Second Circuits have applied *Madoch*'s reasoning to find that where an inmate is aware that his jail calls with his attorney are being recorded, those calls are not protected

by the attorney-client privilege.  In *United States v. Hatcher,* 323 F.3d 666, 674 (8th Cir. 2003), the Eighth Circuit considered whether the attorney-client privilege applies to calls between inmates and their attorneys on recorded jail phones.[9]  In that case, the defendants had requested the jail calls between the cooperating co-conspirators and their attorneys.  *Id.*  The district court refused to order the Government to turn over those calls, reasoning that the calls were protected by the attorney-client privilege.  *Id.*  However, the Eighth Circuit reversed the district court:

> **The presence of the prison recording device destroyed the attorney-client privilege.  Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private.  The presence of the recording device was the functional equivalent of the presence of a third party.  These conversations were not privileged.**

*Id.* (emphasis added).

Likewise, in *United States v. Mejia,* 655 F.3d 126, 133-35 (2d Cir. 2011), the Second Circuit held that where a defendant knows that his jail call is being recorded, he cannot meet the "made in confidence" element of the attorney-client privilege.  In arriving at this conclusion, the Second Circuit stated:  "The fact that the call was being recorded amounts essentially to the presence of an unsympathetic third party – BOP – listening in." *Id.* at 134.  The Second Circuit noted that there was no indication that Mejia could not have contacted his attorney directly without being monitored.  *Id.*  The Second Circuit also noted that its "sister Circuits agree" that no privilege exists, including the Seventh Circuit with its consistent finding in *Madoch. Id.* at 133.

The district courts within the Seventh Circuit have held that recorded jail calls are not protected by the attorney-client privilege.  *Bishop v. White,* 2020 WL 6149567 (N.D. Ill. 2020) at *8; *Pursley v. City of Rockford,* 2020 WL 1433827 (N.D. Ill. 2020) at *5;  *Simon v. Northwestern*

---

[9]       Mr. Margulis' office is located in St. Louis County, Missouri, which is within the Eighth Circuit.

*University,* 2017 WL 66818 (N.D. Ill. 2017) at *5-6; *United States v. Thompson,* 2007 WL 2700016 (C.D. Ill. 2007) at *2.  In *Thompson,* the Central District of Illinois noted that, while the Seventh Circuit has not yet specifically addressed the issue of jail calls with attorneys, its reasoning in *Madoch,* that recorded jail calls are not protected by the marital communications privilege, would logically extend to recorded attorney-client conversations.  2007 WL 2700016 at *2.

In *Bishop,* the Northern District of Illinois noted "the inmates in question knew their conversations were being recorded and had no reasonable expectation of confidentiality."  2020 WL 6149567 at *8.  *See also Pursley,* 2020 WL 1433827 (N.D. Ill. 2020) at *5 ("It cannot be that Plaintiff intended his attorney phone calls to be confidential if he knew his phone calls were recorded and still communicated with his attorneys via phone.").  The *Bishop* court added:  "In the Court's view, the attorney-client privilege does not protect Plaintiff's choice to speak to his attorneys on the telephone knowing that the calls were being recorded simply because it was more convenient than adhering to the 'process for scheduling an unrecorded private attorney call.'" 2020 WL 6149567 at *9 (*quoting Pursley,* 2020 WL 1433827 at *5).

Many district courts outside of the Seventh Circuit have likewise concluded that recorded jail calls, where the parties know they are being recorded, are not protected by the attorney-client privilege.  *See, e.g., United States v. Baca,* 332 F.R.D. 710, 712 (D. N.M. 2019)(where preamble states calls are "subject to monitoring and recording," defendant waives attorney-client privilege, even when his attorney did not hear the preamble); *United States v. Chaiban,* 2007 WL 437704 (D. Nev. 2007) at *20 (in case where jail:  (1) had policy of recording all telephone calls, except to attorneys who registered their numbers with jail to not be recorded; and (2) provided "clear and unequivocal notices to inmates that their calls may be monitored and recorded; holding:  "[T]he court concludes Chaiban and Murray could not reasonably have expected that their conversations

would be confidential and that Chaiban's telephone conversations with Murray at issue here are not protected by the attorney-client privilege."); *United States v. Lentz,* 419 S.Supp.2d 820, 827-28 (E.D. Va. 2005)("[A]n inmate's telephone conversations with counsel are not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring.  In these circumstances, Lentz could not reasonably have assumed that his conversations with Mr. Salvato would be confidential.").

In his motion to dismiss, Defendant Tiner cites *United States v. Carter,* 429 F.Supp.3d 788 (D. Kan. 2019) for the proposition that even soundless video recordings can constitute confidential attorney-client communications.  R. 98 at p. 4.  The facts in *Carter*, however, were significantly different than the facts in the present case.  As the *Carter* court noted, the jail in Kansas provided no notice to either the attorneys or the detainees that their meetings were being video recorded. 429 F.Supp.3d at 833.  With regard to audio recordings of calls between inmates and their attorneys, the *Carter* court found that the jail "affirmatively misrepresented" that their calls were exempt from the jail's recording policy.  *Id.* at 896.  The court also noted that the detainees in the Kansas jail had no guaranteed option for conducting non-recorded calls with their attorneys.  *Id.* The *Carter* court found that these facts distinguished the case before it from cases like *Hatcher* and *Mejia* where the inmates and attorneys knew their calls were being recorded, and failed to take advantage of other methods available to them for conducting private conversations.  *Id.*[10]

---

[10]    Another distinguishing fact about the *Carter* case is that the district court there analyzed whether the actions of the defendants and their attorneys amounted to a waiver of the attorney-client privilege.  429 F.Supp.3d at 892-93. The *Madoch, Hatcher,* and *Mejia* holdings, however, were all based upon the fact that the defendant could not meet the *confidential communications* element of the privilege.  Likewise, in the present case, because Tiner and his attorney were informed that their calls were subject to recording, the confidential communications element of the attorney-client privilege has not been met.

In the present case, both Tiner and Mr. Margulis unquestionably knew that their telephone conversations were subject to being recorded and monitored. The preamble before each call advised them of these exact facts. This preamble put them on notice that their calls were not confidential. Tiner heard this preamble over 100 times in St. Clair County Jail and has spent extensive time in prison. Mr. Margulis heard this preamble before each of his calls with Tiner and has been practicing criminal law for decades. Further, Tiner conducted these calls from the cellblock, where he could clearly see that other inmates could easily listen to his conversations. To the extent that they wanted to conduct private conversations, they had several options available to them, such as in-person meetings, using the private attorney phone, conducting private Zoom meetings, and asking that calls to Mr. Margulis' number be excluded from recording in the Securus system. Not only were Tiner and Mr. Margulis aware of these options for private conversations, they took advantage of these options on multiple occasions. R. 98 at p. 2; Ex. 2 at ¶¶ 7, 9, 11.

After they were specifically advised that their conversations on the phones located inside the cellblocks were subject to being recorded and monitored, neither defense counsel nor Tiner can credibly claim that they thought those conversations were confidential.[11] Lack of confidentiality destroys the privilege.

As the Government noted at the beginning of this section, the threshold question this Court must decide is whether the recorded jail calls between Tiner and Mr. Margulis were protected by the attorney-client privilege. Because Tiner knew that the calls were not confidential, the answer to this question is clearly "No." To reach a different conclusion, this Court would have to ignore

---

[11]    In footnote 3 of the motion to dismiss, the defense argues: "Had the Government actually employed an effective taint team, this never would have happened." The United States takes issue with this comment. In reality, if Tiner and Mr. Margulis had taken advantage of other methods of conducting confidential communications, rather than (as the defense contends) discussing their strategies during telephone calls they knew were being recorded and monitored, this situation would never have happened.

the Seventh Circuit's reasoning in *Madoch*, find that the Eighth Circuit's holding in *Hatcher* and the Second Circuit's holding in *Mejia* were wrong, and chart a different path than the other district courts in this circuit that have considered the same question.

Because the recorded jail calls between Tiner and Mr. Margulis were not protected by the attorney-client privilege, the defense's motion should be denied without a hearing.

 B. No One on the Prosecution Team has Listened to the
   Substance of any Conversations between Tiner and his Attorney

As stated in the previous section, the jail calls between Tiner and Mr. Margulis are not protected by the attorney-client privilege. Despite this fact, no one from the prosecution team has listened to the substance of these calls. No one has heard any communications between Tiner and Mr. Margulis that were made for purposes of obtaining legal advice. In fact, besides a few initial pleasantries, no one has heard any recorded communications between Tiner and Mr. Margulis at all. Even assuming, only for the sake of argument, that the calls were protected by the attorney-client privilege, there has been no invasion of that privilege.

In *United States v. Robinson,* 404 Fed.Appx. 77 (7th Cir. 2010), the Seventh Circuit considered a factual scenario very similar to the present case. On the eve of trial in that case, the Government disclosed to the defense transcripts of Robinson's jail calls, including calls with defense counsel. *Id.* at 79. The transcripts of the calls were obtained for security purposes, to ensure that the defendant was not threatening witnesses. *Id.* The FBI agent and prosecutor told the district court that they had been careful not to review the transcripts of calls involving Robinson and his attorney. *Id.*

The Seventh Circuit granted defense counsel's *Anders* motion and dismissed Robinson's appeal. *Id.* at 81. The court held that, because neither the agent nor the prosecutor had reviewed the defendant's conversations with his attorney, "Robinson could not possibly show an

infringement on his relations with his attorney, let alone one that prejudiced his defense at trial." *Id.* at 79. *See also United States v. DiDomenico,* 78 F3d 294 (7th Cir. 1996)(affirming conviction where Government provided affidavits from prosecution team denying that they received any information from bugging of attorney/client meeting room at jail, and defense provided no evidence to counter the Government's affidavits[12]).

*Weatherford v. Bursey,* 429 U.S. 545, 547-48 (1977), involved an undercover Government agent (Weatherford) who participated in meetings between Bursey and his attorney. Weatherford attended those meetings because he was invited by Bursey and wanted to avoid being exposed as an undercover agent. 429 U.S. at 557. Weatherford did not share with the prosecutor any information he learned about Bursey's trial strategies or plans. *Id.* at 548. After serving his sentence, Bursey brought a § 1983 action against Weatherford. *Id.* at 839. The district court found for Weatherford, but the Fourth Circuit reversed.

In reversing the Fourth Circuit and reinstating the judgment for Weatherford, the Supreme Court held: "The argument founders on the District Court's express finding that Weatherford communicated nothing at all to his superiors or to the prosecution about Bursey's trial plans or about the upcoming trial. . . . There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment. . . ." 429 U.S. at 556-58. The Supreme Court also noted that the Government's purpose in having Weatherford participate in the meetings was not to learn the

---

[12]        In *DiDomenico,* the Seventh Circuit held that the district court did not abuse its discretion by declining to hold an evidentiary hearing. 78 F.3d at 300. The court noted that the Government had submitted affidavits indicating that the prosecution team had not listened to any tapes of bugged conferences at the MCC between inmates and their lawyers. *Id.* at 300-01. Finding that the principles of summary judgment under the Federal Rules of Civil Procedure were applicable by analogy, the Seventh Circuit found: "By submitting affidavits the government shifted to the defendants the burden of submitting counteraffidavits that would show there was an issue that only an evidentiary hearing could resolve. The defendants did not take up the burden although they had many months to do so." *Id.*

defense's trial strategies, or intrude on the lawyer-client relationship. *Id.* at 557. Weatherford's sole purpose in attending the meetings was to protect his undercover status. *Id.*

In the present case, the United States never had any intention of learning the defense's trial strategies, or listening to conversations between Tiner and his lawyer. The sole purpose in obtaining the jail calls was to ensure that Tiner was not threatening witnesses. Once the calls were in the Government's possession, the undersigned produced the calls to the defense, as required by Rule 16. This is the sum and substance of what happened in this case.

Consistent with these intentions, no one from the prosecution team has listened to the substance of any of the conversations between Tiner and Mr. Margulis. The Agent who reviewed the jail calls for threats, Brad Roessler, did not listen to any of the Tiner/Margulis calls. Ex. 4, ¶ 11. None of the other agents working on the case have listened to those calls. Ex. 4, ¶ 6; Exhibit 10 (Affidavit of Adam Hoberg) ¶ 2. None of the U.S. Attorney's Office personnel involved with the prosecution have listened to any of those calls. Ex. 7, ¶ 8; Exhibit 11 (Affidavit of Luke Weissler) ¶ 3. Even the filter agent, AUSA Barke, did not listen to the substance of any Tiner/Margulis calls. Ex. 6, ¶ 8. And, while the undersigned AUSA briefly clicked on three of the calls while reviewing the discovery to be produced, he immediately exited the files when he heard Mr. Margulis' voice. Ex. 5, ¶¶ 15-19. The sworn statements attached to this response confirm all of these facts.[13]

As explained in the preceding section, the recorded jail calls between Tiner and his lawyer are not protected by the attorney/client privilege. But even if they were, there has been no violation

---

[13]     The defense notes that the jail calls between Tiner and Mr. Margulis were also contained in the discovery that was sent to Greg Smith, the attorney for co-defendant Matissia Holt. R. 98 at p. 3. As with the discovery that was sent to Mr. Margulis, the undersigned noted the presence of the jail calls in the cover letter that was sent to Mr. Smith. Ex. 5, Ex. F. Neither Mr. Smith nor his client have listened to any of these calls. Mr. Smith and Ms. Holt have both provided affidavits establishing these facts. *See* Ex. 8; Ex. 9.

of that privilege.  *See United States v. Johnson,* 2016 WL 297451 (D. Utah 2016) at *5 (denying motion to dismiss indictment without a hearing where the Government had legitimate justification for obtaining privileged materials, and "substance of the materials was *never disclosed to the prosecutors,* outside of a single document viewed by an AUSA who ceased review once she was aware it might be attorney-client privileged communication and did not review any further documents");[14] *Cooper v. Mayfi,* 2008 WL 608336 (N.D. Cal. 2008) at *13 (holding that the government did not act affirmatively to intrude into the attorney-client privilege by seizing privileged documents from the defendant's jail cell, because there was no evidence the Government searched the cell to deliberately obtain the defense's strategy and the prosecutor filed a declaration stating he had not seen the material).

In his motion, Tiner cites a number of cases in which various courts have found that the Government violated the defendant's attorney-client privilege.  Each of those cases, however, is distinguishable from the present case.  In each of those cases, the Government actually listened to or viewed confidential communications between the defendant and his attorney, or otherwise interfered with the defense counsel's relationship with his client.  *See United States v. Morrison,* 449 U.S. 361, 362 (1981)(DEA agents met with indicted defendant, outside her attorney's presence, and asked her to cooperate); *Shillinger v. Haworth,* 70 F.3d 1132, 1134 (10th Cir. 1995)(deputy sheriff, who was being paid by defense counsel for purposes of facilitating trial

---

[14]     The *Johnson* court also noted:  "Cases subsequent to *Shillinger* have shown that 'purposeful intrusion' does not occur merely by the prosecution obtaining privileged materials; rather it is what the prosecution does with the materials *after obtaining them* that determines whether there has been a Sixth Amendment violation."  2016 WL 297451 at *5.

The defense cites to Illinois Rule of Professional Responsibility 4.4, which prohibits lawyers from using methods to obtain evidence that violate the person's legal rights.  There has been no violation of Rule 4.4 in this case, however, because:  (1) the recorded jail calls were not protected by the attorney-client privilege; and (2) even if they were, the undersigned AUSA did not hear the substance of any of the calls, and, thus, there was no violation of Tiner's Sixth Amendment rights.

preparation sessions with incarcerated defendant, told prosecutor what was discussed during defense's trial prep sessions); *Richards v. Jain,* 168 F.Supp.2d 1195, 1198 (W.D. Wash. 2001)(plaintiff's firm obtained and reviewed materials marked "Attorney-Client Privileged"); *United States v. Orman,* 417 F.Supp. 1126, 1130-31 (D. Colo. 1976)(Defendant's phone was tapped and DEA agents eavesdropped on her conversations with Federal Defender).

Finally, even if Tiner could establish that his jail calls were protected by the attorney-client privilege, and that the United States violated the privilege, he has not established that he suffered any prejudice.  *See DiDomenico,* 78 F.3d at 301 ("the defendants have accepted that they must show, if not prejudice to their defense . . . at least potential prejudice and for that they would have to show that the prosecution received, directly or indirectly, valuable information from the bugging").  *See also Weatherford,* 429 U.S. at 556 ("As long as the information possessed by Weatherford remained uncommunicated, he posed no substantial threat to Bursey's Sixth Amendment rights); *S.E.C. v. LEK Securities Corp.,* 2018 WL 417596 (S.D. N.Y. 2018) at *4 (refusing to disqualify prosecution team where the defendant "has not pointed to any statement in the Notes . . . that is at odds with the positions it has taken publicly in proposition to the SEC's litigation or that reveals any undisclosed litigation strategy or statement harmful to [the defendant]."); *United States v. Neill,* 952 F.Supp. 834, 841 (D. D.C. 1997)("[A]n intrusion into the attorney-client privilege, standing alone, does not *per se* violate the Constitution.  If the government demonstrates that no harm, that is, no privileged information regarding trial strategy or otherwise has been communicated to the prosecutors and used to the defendants' detriment, there is no constitutional violation."). [15]

---

[15]     To the extent a violation of the Sixth Amendment could be established, the level of any prejudice would determine the appropriate remedy.  In *Morrison*, the Supreme Court stated: "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. . . .   [T]he remedy

In *United States v. Zajac,* 2008 WL 1808701 (D. Utah 2008), the District Court for Utah considered a situation that involved similar facts to the present case.  The Government obtained calls from the Weber County Jail, where Zajac was detained prior to trial, to determine if he made incriminating statements.  *Id.* at 4.  The Weber County Jail was not able to separate Zajac's recorded calls with attorneys from his recorded calls with third parties.  *Id.*  When the Government received the calls, it took efforts not to review any of the recorded conversations with attorneys.  *Id.*  Then,

> to fully comply with the discovery rules, the government provided the incriminating calls as well as the other calls made by the defendant.  The government provided Defendant's counsel the entire record in discovery because the jail had provided the entire record to it.  While the government took care not to review any privileged material, it did not exclude those potentially privileged conversations from defense counsel when it provided discovery.

*Id.*

---

characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted."  449 U.S. at 364-65.

The defense cites the Tenth Circuit's decision in *Shillinger* for the proposition that the Government's intentional intrusion into the attorney-client relationship constitutes a *per se* violation of the Sixth Amendment for which prejudice is presumed.  In *Shillinger,* the Tenth Circuit held:  "In other words, we hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed."

It appears that the Seventh Circuit has rejected the *per se* approach espoused by the Tenth Circuit.  In *United States v. Castor,* 937 F.2d 293, 298 (7th Cir. 1991), the Seventh Circuit interpreted the Supreme Court's decision in *Weatherford* to "reject[ ] *per se* rule in sixth amendment attorney-client privilege cases."

Even if the *Shillinger per se* rule was applied in this case, the defense could not meet its prerequisites.  First, the Government had a legitimate law enforcement purpose for obtaining the jail calls:  to ensure that Tiner was not threatening witnesses.  Secondly, because no member of the prosecution team has listened to the substance of any of the calls, including any advice or trial strategy discussions, there has been no invasion of the attorney-client privilege.  Finally, the Government's obtaining of the calls between Tiner and Mr. Margulis was not intentional.  It simply was not feasible to obtain Tiner's recorded jail calls without obtaining the jail calls which Tiner and Mr. Margulis conducted on the recorded cellblock phones.  And once those calls were obtained, the United States took significant steps to avoid members of the prosecution team listening to those calls.

Based upon the facts before it, the Utah court denied Zajac's motion to dismiss the indictment. *Id.* at 5. The court stated: "Defendant fails to provide any specific communication, transcript, or documentation which demonstrates that the government obtained any evidence or content from these conversations or listened to the conversations." *Id.* The *Zajac* court concluded that the defendant's "conclusory and speculative accusations" failed to establish that the Government had engaged in egregious and outrageous conduct, or that it had violated Zajac's rights. *Id. See also United States v. Robinson,* 96 F.3d 1446 (6th Cir. 1996) at p. 11 ("In the absence of any evidence to the contrary, the district court was certainly entitled to credit the government's assertion that it did not view any privileged materials during the search.").

In the present case, like the situation in *Zajac,* the Government obtained Tiner's jail calls for a legitimate law enforcement purpose. That purpose was to ensure that Tiner was not threatening witnesses. Similar to *Zajac,* the Government took steps to ensure that the agents did not listen to calls between Tiner and his attorney. In order to comply with Rule 16, the Government produced all of the calls in its possession, including those involving Tiner and his attorney. In response to Tiner's motion to dismiss, the Government has provided this Court with sworn statements of all of the involved individuals affirming that they have not listened to the substance of any conversations between Tiner and his attorney, nor have they heard any legal advice or defense strategies. The defense has not, and cannot, establish that Tiner's Sixth Amendment rights have been violated.

    C.    <u>An Evidentiary Hearing is Unnecessary</u>

Defendant Tiner has not met the burden of establishing that his recorded jail calls were protected by the attorney-client privilege. Because he knew the calls were subject to recording and monitoring, the calls were not confidential. *Madoch,* 149 F.3d at 602; *Hatcher,* 323 F.3d at

674; *Mejia,* 655 F.3d at 133-35; *Bishop,* 2020 WL 6149567 at *8; *Pursley,* 2020 WL 1433827 at *5; *Simon,* 2017 WL 66818 at *5-6; *Thompson,* 2007 WL 2700016  at *2.  Because the defense has not met the threshold burden of establishing that the calls were protected by the attorney-client privilege, there is simply no need for an evidentiary hearing.

Once again, assuming for the sake of argument that the calls were protected by the privilege, there is no issue of material fact that an evidentiary hearing would resolve.  *See DiDomenico,* 78 F.3d at 300-01.  No one from the prosecution team heard the substance of any of calls, including the defense's trial strategies or legal advice.  Period.  The Government has provided sworn statements to the Court establishing this fact.  And the Government has no intention of using any of these calls as exhibits at trial.  Under these circumstances, an evidentiary hearing would serve no purpose.

## IV.  CONCLUSION

More than six months after the Government self-disclosed all of the relevant facts, Defendant Tiner now claims that his attorney-client privilege has been violated.  Although they were provided with multiple options for conducting private conversations, and they took advantage of these options on multiple occasions, the defense now claims that they discussed their legal strategies on the cellblock phones, which they were specifically advised were subject to recording and monitoring.  In making the argument that these conversations were privileged, the defense ignores both the appellate precedents and the district court decisions from this circuit which hold that such conversations are not confidential.

The Government has acted in good faith throughout these proceedings.  Despite the fact that the calls from the cellblock phones are not privileged, the Government went out of its way to avoid listening to the conversations between Tiner and Mr. Margulis conducted on those phones.

No one from the Government has listened to the substance of any of those calls.  Other than clicking on the files and immediately closing the files when the speakers voices were heard, no one from the Government has listened to any portions of the calls.  Thus, even if the calls were protected by the attorney-client privilege, there has been no invasion of the privilege and Tiner cannot establish any prejudice.

For all of these reasons, the motion to dismiss, or in the alternative to disqualify the prosecution team, must be denied.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney


s/ Scott A. Verseman
SCOTT VERSEMAN
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20 CR 30166-SPM-01 |
| | ) | |
| EMMITT T. TINER, | ) | |
| | ) | |
| Defendants. | ) | |

**Certificate of Service**

I hereby certify that on December 22, 2021, I caused the foregoing "United States' Response to Defendant Tiner's Motion to Dismiss the Indictment, or, in the Alternative, to Disqualify the Prosecution Team" to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all attorneys of record.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

s/ *Scott A. Verseman*

SCOTT VERSEMAN
Assistant United States Attorneys
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700
Fax:  (618) 628-3720